Janet CIOTOLI as Legal Representative of the Estate of Richard A. Ciotoli, deceased, Petitioner,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 88–59V.

United States Claims Court.

Nov. 9, 1989.

Anthony Colantoni, Chicago, Ill., for petitioner.

Richard Parker, Washington, D.C., for respondent. He subsequently withdrew from the proceedings.

## ORDER

FUTEY, Judge:

This child vaccine action is brought pursuant to the National Childhood Vaccine Injury Act of 1986 as amended, 42 U.S.C. § 300aa–10, *et seq.* (Supp. V 1987), which establishes a program for payment of compensation for injuries or deaths resulting from the administration of vaccines.

The petition in this case was filed as of November 29, 1988, and this matter comes before the court on Special Master Elizabeth E. Wright's Report and Recommendation for Judgment filed October 10, 1989.[1] No objection to the Special Master's findings and conclusion of law has been filed by either petitioner or respondent.

Pursuant to 42 U.S.C. § 300aa–12(d)(2), the Special Master's Report and Recommendation, including the findings and conclusions of law, is hereby adopted as the Opinion of the court. The full report is attached hereto.

Accordingly, the petitioner is entitled to an award of $250,000 as statutory compensation and attorneys' fees and costs in the sum of $20,310.55.

The Clerk is directed to enter judgment for the petitioner in the sum of $270,310.55. No additional costs to be awarded.

IT IS SO ORDERED.

---

1. The report filed on October 10, 1989, under footnote 1 provided that within 14 days of its filing, the parties shall designate any material subject to § 300aa–12 and not for deletion prior to public access. No designation was submitted. This Order contains no additional material. Accordingly, public access for this Order and Report shall now be afforded.

## REPORT AND RECOMMENDATION FOR JUDGMENT [*]

Oct. 10, 1989

ELIZABETH E. WRIGHT, Special Master.

This is an action for compensation for the vaccine-related injury and death of Richard Anthony Ciotoli (hereafter "Richie") brought by his mother and the administrator of his estate, Janet Ciotoli, under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. § 300aa–10 *et seq.* (Supp. V 1987) (hereafter the "Vaccine Act").[1] A hearing was held on the issue of entitlement to compensation on July 25, 1989, in Washington, D.C. At the hearing, petitioner presented two witnesses: Mrs. Janet Ciotoli, Richie's mother; and Dr. Mark Geier, a geneticist and research physician.

■■ The attorney of record representing respondent, Richard Parker, withdrew from this case on May 9, 1989.[2] No new attorney entered an appearance in this matter to represent respondent following Mr. Parker's withdrawal. Although notified, respondent did not participate in the July 25, 1989, evidentiary hearing in this matter. While respondent thus presented no evidence regarding possible alternate causation, this special master has reviewed all the evidence in the record to determine whether Richie's death could have been due to factors unrelated to the administration of the DPT vaccine.

Pursuant to § 300aa–12(c), and United States Claims Court Vaccine Rule 18(a), and for the reasons stated below, the undersigned recommends that judgment be entered for petitioner in the amount of $270,310.55 consisting of $250,000.00 to compensate petitioner for the death of petitioner's son, Richie, $15,018.00 in attorneys' fees, and $5,292.55 in other costs.

### ISSUE

The issue to be decided is whether petitioner is entitled to compensation for the death of Richie Ciotoli under the provisions of the Vaccine Act—more specifically—(1) whether petitioner has demonstrated by a preponderance of the evidence that Richie Ciotoli suffered (a) shock collapse or hypotonic-hyporesponsive collapse; and/or (b) encephalopathy within three days of the administration of a diphtheria-pertussis-tetanus (hereafter "DPT") vaccine and died as a result thereof, and (2) that there is not a preponderance of the evidence that Richie's death was due to factors unrelated to the administration of the DPT vaccine in question.

### I.

### HEARING RECORD

*Background facts.*[3]

Richie Ciotoli was born to Janet and Anthony Ciotoli on November 9, 1982, the

---

[*] This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

1. Hereafter, all references to sections of the Vaccine Act will eliminate the reference to 42 U.S.C.

2. There is no provision in the Vaccine Rules for the withdrawal of counsel by respondent. Vaccine Rule 81(d)(4) does provide for a "change" in counsel whenever a case is reassigned to another attorney. However, given the plain mandate of the Vaccine Act that petitioners be accorded speedy rulings on their claims, the special master had no choice but to continue to process the action without undue delay and in whatever way was practicable, with or without the participation of the respondent. Further, it is clear pursuant to section 300aa–13(a)(1)(A) of the Vaccine Act and Vaccine Rule 55(c) that even if the respondent does not participate, and therefore, is in technical default, the petitioner must still establish a claim for compensation under the Vaccine Act by evidence satisfactory to the court.

3. It will be noted that the facts are set forth herein exhaustive detail. That is because, as will be noted, *infra*, respondent has propounded an alternate cause of death. The facts set forth herein are necessary to address the issue of alternate causation.

healthy product of an uncomplicated pregnancy. *See* Transcript of July 25, 1989 Hearing, *Ciotoli v. Secretary of Dept. of Health and Human Services*, No. 88–59V, at 28 (Cl.Ct.) (hereafter "Tr. at ___"). He weighed six pounds six ounces at birth and his mother described him as a "very normal." Tr. at 28; *see also* Hearing Exhibit 1 at 3, *Ciotoli v. Secretary of Dept. of Health and Human Services*, No. 88–59V (Cl.Ct.) (hereafter "Ex. ___").

APGAR tests conducted on Richie resulted in scores of 4 and 7, respectively.[4] Ex. 1 at 4. Richie experienced no problems during his first few days of life and was discharged from the hospital on November 11, 1982, weighing six pounds three and a half ounces. Ex. 1 at 3; Tr. at 35.

Mrs. Janet Ciotoli, Richie's mother, testified that when Richie came home from the hospital, he was "obviously a very good eater. He drank all of his bottles. He cried when he wanted us or cried when he wanted his bottle or his diaper changed." Tr. at 29–30. When he was about five days old, Richie's stools became loose and Mrs. Ciotoli called Dr. Manrique Quinto, Richie's pediatrician. Dr. Quinto suggested that Mrs. Ciotoli change Richie's formula. Tr. at 30. After changing from Similac with iron to Isomil, Richie continued to have approximately five to eight loose stools a day. Tr. at 31.

On November 22, 1982, when he was 13 days old, Mrs. Ciotoli took Richie in to see Dr. Quinto because the problem with Richie's loose stools had not resolved and Dr. Quinto wished to examine Richie and have him weighed. Tr. at 31. During the office visit, Dr. Quinto examined and weighed Richie. He weighed seven pounds two ounces, a gain of 14½ ounces from his hospital discharge weight 11 days earlier. Ex. 2 at 5. Mrs. Ciotoli described the problem of Richie's loose stools to the nurse, who recorded Mrs. Ciotoli's account in Richie's medical chart. *See* Ex. 2 at 5. Mrs.

Ciotoli told the nurse that Richie was having approximately eight stools a day, that the change in formula didn't improve his condition, and that he was irritable and wouldn't sleep more than one hour at a time. *Id.;* Tr. at 33–34. Mrs. Ciotoli also told the nurse that Richie had no fever, which a rectal temperature taking during the doctor's visit confirmed. Tr. at 34, Ex. 2 at 5.

Dr. Quinto found nothing wrong with Richie and prescribed a medication to help break up any gas in his stomach. Tr. at 36, 38; Ex. 2 at 5. In addition, Dr. Quinto suggested that Mrs. Ciotoli change his formula to Similac without iron. Mrs. Ciotoli testified that she stopped at the store on the way home from the doctor's office and bought the formula. Richie's loose stools stopped immediately. Tr. at 38. He continued to have multiple bowel movements in a 24 hour period but never again experienced any diarrhea or loose stools. Tr. at 38–39.

Following the November 22nd visit to the pediatrician, Mrs. Ciotoli related that

Richie was eating very well. He was becoming more active. He was lifting his head. He was very strong. He recognized my husband and my voice, my son's voice—my other son's voice. He would cry sometimes, but it was always for his bottle or he wanted to be picked up or he had something in his diaper that he wanted changed; and he was very easily pacified.

Tr. at 39–40. He started to sleep two hours at a time but would be up for long intervals between naps. Tr. at 40. However, he was never sick. *Id.*

On December 10, 1982, Mrs. Ciotoli took Richie to see Dr. Quinto for his one month well-baby checkup. Tr. at 39, 41. At that time, Richie weighed nine pounds six and a half ounces. Tr. at 44; Ex. 2 at 5.[5] At

---

**4.** APGAR scores numerically rate the condition of a newborn by assessing the newborn's heart rate, respiratory effort, muscle tone, reflex irritability and color. Generally, two tests are performed, at one and five minutes after birth. A perfect APGAR score is ten. *The Merck Manual of Diagnosis and Therapy* 986 (13th ed. 1977).

**5.** It should be noted that the physician's notes contain an error in notating the date of that office visit. The nurse apparently incorrectly

that time, Mrs. Ciotoli informed the nurse that the medication seemed to be helping but that he was spitting up some. With respect to his bowel movements, Mrs. Ciotoli told the nurse that he was having approximately five stools a day that were a good consistency, but a large amount. Ex. 2 at 5. In response to a question from the nurse as to how Richie was eating, Mrs. Ciotoli told her that Richie seemed "starved." Ex. 2 at 5; Tr. at 43. Mrs. Ciotoli hoped that the pediatrician might suggest that she start him on cereal. Tr. at 43. According to Mrs. Ciotoli, Dr. Quinto complimented her on Richie's weight gain.[6] Following the December 10 pediatrician visit, Mrs. Ciotoli testified,

> Richie was getting bigger, much more active. He was recognizing things with his eyes. We had toys in his crib and mobiles. He recognized our faces. He was doing a lot more with his legs, if you held them up to your chest he would sort of dig his feet into you to try to crawl up. He was very demanding and very vocal when he wanted something. But he was very easily pacified. He loved his bath.... He was eating fantastic. He would drink all of his formula. And he wouldn't leave a drop. I had started him on cereal once a day about Christmas time.

Tr. at 45–46.

He had no problems with fevers, colds, flu or diarrhea during this time, although he maintained his normal five bowel movements a day. Tr. at 46. He continued to sleep at intervals of two to three hours. Tr. at 47.

On January 12, 1983, at approximately 1:30 p.m., Mrs. Ciotoli took Richie to Dr. Quinto's office in Binghampton, New York, for his two month well-baby checkup. Tr. at 48; Ex. 2 at 6; *see also* Affidavit of Janet Ciotoli, attached as Exhibit A to Amended Petition for Vaccine Compensation, *Ciotoli v. Secretary of Health and Human Services*, No. 88–59V (Cl.Ct.), filed July 14, 1989. At that time, he weighed eleven pounds nine ounces.[7] During the visit, Mrs. Ciotoli told the nurse that Richie was still sleeping only up to two or three hours at a time, but that he was doing well with eating cereal once a day and that his bowel movements were normal. Ex. 2 at 6; Tr. at 50.

During the visit, Dr. Quinto gave Richie a physical examination and noted in the chart that Richie was "doing well at this time." Ex. 2 at 6; Tr. at 54. Following the exam, Dr. Quinto placed Richie on his stomach and gave him a DPT vaccination in his left upper thigh area. Tr. at 55; Ex. 2 at 6. Immediately after the vaccination, Richie began to cry very loudly and continued to cry until Mrs. Ciotoli put him in his car seat at approximately 2:00 p.m. Tr. at 57.

On the way home, Mrs. Ciotoli stopped at a friend's house and stayed approximately an hour and a half. Tr. at 58–59. She arrived home at about 4:00 p.m. During that time, Richie was quiet and didn't appear to be doing anything abnormal, according to his mother. Tr. at 59. However, when she changed his diaper, Mrs. Ciotoli noticed that there was localized redness and swelling on Richie's leg at the injection site. Tr. at 59.

At about 5:30 p.m., Mrs. Ciotoli gave Richie half a baby aspirin, crushed and mixed with a little water, on Dr. Quinto's instructions. Tr. at 60–61. At that time, Richie took eight ounces of formula and, at about 6:00, he fell asleep until around 8:00 or 8:30 p.m. Tr. at 61. When he awoke, Richie started crying. When she again changed Richie's diaper, she noticed that the site of the vaccination had become very swollen and purplish red and felt hot to the touch. Tr. at 62.

After she changed Richie's diaper, Mrs. Ciotoli gave Richie another eight ounces of

---

noted the date of the visit as "2/10/82" rather than "10/2/82."

**6.** Between November 22nd and December 10th, Richie had gained two pounds four and a half ounces.

**7.** This represented a weight gain of two pounds two and a half ounces from December 10th till January 12th.

formula. His temperature remained normal. Tr. at 64–65. His mother put him in his crib at about 10:30 p.m. when he started to fall asleep. Tr. at 65. After only half an hour, he awoke and was fussing. Mrs. Ciotoli checked him and put him back to bed since she couldn't find anything wrong with him. She said she dozed off again but would awaken periodically, hear him fussing and check him. Tr. at 66, 68. At about 1:30 a.m., he started to cry hard. Tr. at 66. When she changed him, Mrs. Ciotoli noticed that the injection site had become a big purple red swollen blotch that was spreading down the side of his leg. According to his mother, it covered an area from the injection site "almost down to his knee." Tr. at 67.

When she tried to feed him a bottle, Richie only took two ounces of formula, which was unusual for Richie. Tr. at 68–69. At about 2:00, Mrs. Ciotoli put Richie back in his crib and went to bed. At about 3:00, Richie started to scream. When she picked him up, he continued to cry and was inconsolable whether being held or laying in his crib. Tr. at 69–70. He continued to cry until about 5:00 a.m. when she put him to bed and fell asleep. At about 6:00 a.m., Mrs. Ciotoli awoke to hear Richie crying in a high-pitched manner that sounded "like a cat howl." Tr. at 70–71. Mrs. Ciotoli said she had never heard any child cry like that before. Tr. at 71. Mrs. Ciotoli listened to Richie cry for awhile and got up at about 7:00 a.m. to pick him up. He was "very limp." Tr. at 72. According to Mrs. Ciotoli,

> I thought he appeared like a rag doll with his arms and legs were sort of limp, his head was resting on my shoulder and he was staring away from me, and that wasn't normal for him because usually when I picked him up he would get all excited and his head would be held up. His arms and legs were not moving at this time.

Tr. at 72. Mrs. Ciotoli testified that even though Richie exhibited unusual behavior at that time, she thought then that it was because "he had had a rough night" and was tired. Tr. at 72.

Mrs. Ciotoli then took Richie downstairs and changed his diaper. He was cool to the touch. He drank eight ounces of formula and ate some cereal. Tr. at 73. Mrs. Ciotoli noticed that under Richie's right nostril was a little blue spot. According to Mrs. Ciotoli, "it looked like a bluish-grayish blister underneath his nostril and part of his nose was red." Tr. at 73. Richie then fell back asleep at about 8:00 a.m. in his infant seat, which, according to Mrs. Ciotoli, was very atypical. Tr. at 74. Mrs. Ciotoli recounted what happened next:

> Right after he fell asleep and he was sitting in his [infant seat] next to me at my dining room table, he was sleeping very soundly and I was writing bills. All of a sudden I heard Richie have an explosion of gas in his diaper. I knew it was diarrhea, I could hear it. And what I couldn't believe that Richie didn't wake up. He always hated to have anything in his diapers, and he slept right through it.

Tr. at 74–75. Mrs. Ciotoli changed his diaper and found it was "filled with a large amount of light brown mucousy funny, very foul smelling diarrhea." Tr. at 75. This was the first episode of diarrhea that Richie had experienced since she changed his formula in November 1982. Tr. at 76.

Richie awoke while having his diaper changed but fell back asleep before 9:00 a.m. At about 10:00 a.m., his mother noticed that Richie's eyes were open. Tr. at 76. Mrs. Ciotoli related that then:

> I went to pick him up and he was wet. His receiving blanket that I had wrapped around him was saturated. His T-shirt was saturated. His diaper was saturated. I had a receiving blanket and a crib sheet or a bassinet sheet underneath him and that was also saturated.

Tr. at 77. The liquid was clear and very musky smelling. Id. At the time, Richie was not crying except when his mother touched or moved his leg. Id. At about 10:30, Mrs. Ciotoli took Richie upstairs to give him a bath. He just laid in the bath with his arms and legs immobile and with his eyes just staring. Tr. at 78. When Mrs. Ciotoli tickled him to get him to smile, he continued to stare. Tr. at 79. His

fingers felt "ice cold." Tr. at 78. His abdomen was also cool. Mrs. Ciotoli quickly got him out of the tub and dressed him, turned up the heat, and put socks on his hands to warm him up. Tr. at 79.

At about 11:00 a.m., Mrs. Ciotoli gave Richie four to eight ounces of warm water. She gave him the water because he had had diarrhea and Mrs. Ciotoli wanted to avoid giving Richie any milk products. Tr. at 80. He then fell asleep again and slept until approximately 12:30 or 1:00 p.m. Tr. at 80–81.

After he awoke, while she was changing Richie, Mrs. Ciotoli noticed about a tablespoon of yellow or whitish cream diarrhea. The injection site looked worse and the purplish blotch appeared larger. Tr. at 81. After changing his diaper, Mrs. Ciotoli made Richie another bottle of warm water. He drank all eight ounces but it took a long time because he would suck awhile and fall asleep. Tr. at 82–83. After Richie finished his bottle, at about 2:00 p.m., Mrs. Ciotoli again changed his diaper and noticed about a teaspoon of creamy yellow or white diarrhea. Richie then fell asleep again. Tr. at 83.

At about 3:00 p.m., Richie was still asleep but Mrs. Ciotoli noticed that his fingers were "sort of quivering a little bit." Tr. at 84. Richie awoke at about 3:30 p.m. There was nothing in Richie's diaper but Mrs. Ciotoli noticed that his scrotum was drawn up towards his body. Mrs. Ciotoli attempted to feed Richie another bottle of warm water but he sucked for awhile and then gagged and vomited a small amount of the water. Tr. at 84–85. At about 4:30 p.m., Mrs. Ciotoli started spoon-feeding warm water to Richie. At that point, as Mrs. Ciotoli described, Richie "was very quiet. His arms and legs were not moving. He stared straight ahead or stared straight up when I held him." Richie continued to be motionless and limp like a rag doll. Tr. at 85–86.

Between 5:00 and 5:30 p.m., Mr. Anthony Ciotoli, Richie's father, came home from work and spoon fed Richie warm water while Mrs. Ciotoli took a short nap. At about 7:30, Mrs. Ciotoli left the house to buy Pedialyte and run a few errands. Tr. at 87–88. She returned at about 9:00 p.m. and found her husband and Richie asleep on the couch. Mr. Ciotoli awoke and told Mrs. Ciotoli that Richie had had one small "whitish, yellowish diarrhea," and that Richie had finished taking the eight ounces of water that Mrs. Ciotoli had begun giving him at 4:30 and then slept while she was gone. Tr. at 88–89. Mrs. Ciotoli testified that during the entire day, Richie had been awake only three or four hours or less and was limp and rag doll-like. Tr. at 90–91.

Mrs. Ciotoli decided to sleep downstairs on the couch next to Richie's bassinet. At about 10:30 p.m., she noticed that Richie's eyes were open. Mrs. Ciotoli prepared some Pedialyte in a bottle and put the nipple in Richie's mouth. He took a few sucks from the bottle and stopped. He didn't start sucking again and did not respond. His forehead and head were ice cold, wet and clammy. He began to make a sighing sound upon expiration of his breath. Tr. at 92. Mrs. Ciotoli immediately took Richie upstairs and Mr. Ciotoli held Richie while Mrs. Ciotoli called the answering service of the pediatrician's office. A few minutes later Dr. Goodman called. Mrs. Ciotoli described Richie's condition and, while she was talking to the doctor, noticed that Richie's eyes were fully dilated and not responding to the light. Mrs. Ciotoli said she thought she should take Richie to the emergency room and Dr. Goodman suggested that was a good idea. Tr. at 93–94.

While Mrs. Ciotoli was getting dressed, Mr. Ciotoli went out to warm up the car. Mrs. Ciotoli then picked Richie up and noticed that he wasn't breathing and that his eyes were wide open and staring. Tr. at 94. Mrs. Ciotoli attempted mouth-to-mouth resuscitation on Richie but he didn't breathe again. Meanwhile, Mr. Ciotoli came back into the house and called the ambulance, which arrived minutes later. Tr. at 95. During the interval before the ambulance came, vomit came out of Richie's mouth as his mother pressed on Richie's breast bone. Tr. at 95.

Mrs. Ciotoli accompanied Richie in the ambulance to Ideal Hospital, a few minutes away, where he was declared dead at 11:15 p.m., approximately 33 hours following the administration of the DPT vaccination.[8] Tr. at 97, Ex. 5.

*Autopsy Report.*

An autopsy was performed on Richie approximately 11 hours after his death. Ex. 3 at 4.[9] The final autopsy report, dated April 20, 1983, indicates, under the heading "Clinical Diagnoses":

D.O.A.

DPT IMMUNIZATION PREVIOUS DAY

DIARRHEA

Ex. 4 at 1. Under the heading "Final Anatomical Diagnoses" are listed the following:

THYMUS: Hyperplasia [10]

LUNGS: Congestion and edema [11]

BRAIN: Congestion and edema, 500 gms (N. 490 gms)

*Id.* The report contains the following "Clinical History":

This is a 2–month old baby boy who was admitted to the Emergency Room of Wilson Hospital [12] on January 13, 1983 at 2337 hours with CPR in progress. No vital signs were present and the pupils were dilated and fixed. The skin was cold and cyanotic. *He had a history of a DPT shot 2 days prior to this admission and diarrhea for 1 day duration.* He was intubated, intracardiac adrenalin

was given and a nasogastric tube inserted, but he did not respond to CPR[.] 30 minutes after admission he was pronounced dead.

Ex. 4 at 2 (emphasis added). Under the heading "External Examination," the following description occurs: "The body is that of a 2–month–old, white male, *weighing 4880 gms., (9 pounds)* and measuring 50 cm. in length." *Id.* (emphasis added). This description is significant in that it contains an error in conversion. Petitioner put on evidence proving that 4880 grams actually converts to 10 pounds 12 ounces. Tr. at 146. Since Richie weighed 11 pounds 9 ounces when he was administered the DPT vaccination on January 12, 1983, the conversion error is pivotal in ruling out a possible alternative cause of death, as will be discussed, *infra.*

*Death certificate.*

Dr. Melvin Jones, the county coroner of Broome County, New York, signed a death certificate, dated January 13, 1983, recording Richie's death. Under the section labeled "Immediate Cause" is written "Investigation pending." Ex. 5 at 1. A Supplemental Report for Certificate of Death, signed by Dr. Jones on May 24, 1983, lists "Irreversible shock" as the immediate cause of death. Under a heading labeled "Due to, or as a consequence of" is the notation "Probable reaction to D.P.T." Ex. 5 at 2.

---

8. There is conflicting evidence as to the time of death. While the death certificate lists January 13, 1983 at 11:15 p.m. as the time of death (*See* Ex. 5), the autopsy report indicates that Richie was admitted to the emergency room at 2337 hours (11:37) with CPR in progress and that he was pronounced dead 30 minutes after admission, not having responded to CPR. *See* Ex. 4 at 2. The provisional autopsy report, dated January 14, 1983, indicates that Richie died on January 13, 1983 at 1210 hours. *See* Ex. 3 at 4. This would appear to be an error, since all other documentation indicates that Richie was admitted to the hospital sometime after 11:30 p.m. on the evening of January 13.

9. The pathology report indicates the autopsy was performed at 11:00 a.m. on January 14, 1983. Ex. 3 at 4.

10. "Hyperplasia" is defined as "the abnormal multiplication or increase in the number of nor-

mal cells in normal arrangement in a tissue." *Dorland's Illustrated Medical Dictionary* 797 (27th ed. 1988).

11. "Edema" is defined as "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body; usually applied to demonstrable accumulation of excessive fluid in the subcutaneous tissues." *Dorland's Illustrated Medical Dictionary* 530 (27th ed. 1988).

12. Although the autopsy report refers to Wilson Hospital, the emergency room documents indicate that Richie was taken to Ideal Hospital. *See* Ex. 3 at 3. However, it appears from the letterhead of the hospital documents that Wilson Hospital is another hospital under the umbrella of the United Health Services organization.

*Broome County Health Department Report.*

By letter dated February 10, 1984, Dr. Andrew Doniger, the Deputy Commissioner of Health for Broome County, New York, forwarded to Mrs. Ciotoli a copy of a "Report of Illness Following Vaccination" that he had prepared to send to the Center for Disease Control.[13] *See* Ex. 7; Tr. at 161–164. The report lists, among other things, the specific vaccines, by lot number and manufacturer, that were administered to Richie on January 12, 1983. Under the heading "Diagnosis" is listed "Vaccine-associated-shock leading to Cardiopulmonary arrest." Ex. 7 at 2.

*Respondent's medical report.*

During the evidentiary hearing in this matter, the special master offered into evidence the report prepared by the Department of Health and Human Services recommending that compensation be denied in this case (hereafter "HHS report"). At the hearing, counsel for petitioner objected to its admission on grounds that it constituted impermissible hearsay and that the author of the report was not available for cross-examination. On those grounds, the special master declined to receive the report into evidence. *See* Tr. at 155–158.

On October 3, 1989, counsel for petitioner orally withdrew his objection to the admission of the HHS report, without endorsing or acquiescing in its findings. For that reason, the undersigned issued an order, dated October 10, 1989, re-opening the evidentiary hearing record in this matter in order to receive the HHS report into evidence as Court Exhibit 1 (hereafter "Ct.Ex. 1").

The HHS report states that "the physician noted that the infant seems starved," noted continuing diarrhea, and referred to the fact that Richie had lost two pounds nine ounces in two days prior to death.[14] Ct. Ex. 1 at 1–2. It was this assumed weight loss upon which respondent based its recommendation to deny compensation in this case. The HHS report recommends the denial of compensation as follows:

> In this infant the cause of death appears to have been irreversible shock secondary to dehydration. There was a twenty-two percent decrease in body weight over thirty-three hours. Acute weight loss of this magnitude is mainly fluid loss. A more detailed review of the slides of the GI tract might lend a better understanding of the child's chronic diarrhea, the etiology of which has not been addressed. Stool cultures were never performed nor was a radiologic or microscopic delineation of the GI tract to rule out obstructive etiologies.
>
> Vaccination as the cause of death in this infant has not been demonstrated. Anaphylactic or hypotonic shock secondary to vaccination have also not been demonstrated and would certainly not be expected to be accompanied by significant weight loss.

Ct. Ex. 1 at 2.

*Expert testimony of Dr. Mark Geier.*

Dr. Mark Geier, an obstetrical geneticist and medical researcher, reviewed all the available medical records of Richie Ciotoli and has conducted an exhaustive survey of the literature on the effects of DPT vaccine on children. He also published a study in 1978, associated with his research at the National Institutes of Health, regarding the level of endotoxin present in commercial vaccines. Tr. at 104. Dr. Geier was present during the testimony of Mrs. Ciotoli.[15]

---

13. It is Mrs. Ciotoli's understanding that Dr. Doniger forwarded the report to the Center for Disease Control in Atlanta. Tr. at 164.

14. The report cited the autopsy report findings that Richie weighed 4880 grams (9 pounds) upon postmortem examination.

15. Dr. Geier is currently in private practice in the field of obstetrical genetics. Tr. at 100. However, his past work with respect to the levels of endotoxin present in commercial vaccines, in combination with an exhaustive review and compilation of thousands of pages of literature on the issue of the effects of pertussis vaccine, has prepared him to speak authoritatively on the subject of adverse reactions to DPT vaccines. Dr. Geier obtained a B.S. degree from George Washington University in 1970 and received a Ph.D. in genetics from George Washington University in 1973. In 1978, he was awarded a Doctor of Medicine degree from

Dr. Geier believes, to a reasonable degree of medical certainty, that Richie's death was due to the administration of the DPT shot he received on January 12, 1983. Tr. at 125, 138. According to Dr. Geier, Richie·had a uneventful birth and normal neonatal period.[16] Thereafter, Richie experienced a normal weight gain. Tr. at 119–122. He went from six pounds two ounces, upon discharge from the hospital, to seven pounds two ounces on November 22, 1982. He then weighed nine pounds and six and a half ounces on December 10, 1982. His weight remained in the 50th percentile at one and two months of age. Tr. at 121.

With respect to the loose stools that Richie experienced prior to his November 22, 1982, doctor's appointment, Dr. Geier stated that "[i]t's very common among children until you find the right formula for them." Tr. at 119. Dr. Geier asserted that the medical records contain no indication that Richie suffered from chronic diarrhea, or that he was "starving." Tr. at 122. In fact, it was Dr. Geier's opinion that Dr. Quinto would not have entered the notation "doing well" on Richie's medical chart if that were the case. Dr. Geier stated that "at least according to Dr. Quinto's chart there was no cause for concern on his part about the fact that Richie was having five bowel movements per day." Tr. at 123.

Dr. Geier testified that after the administration of the DPT shot on January 12, 1983, it is his opinion that Richie "underwent a severe bout of hyporesponsive shock which eventually became irreversible." Tr. at 124. The most likely cause of such hyporesponsive reaction, contends Dr. Geier, is that "he received a large dose of endotoxin just prior to going into shock." Tr. at 125.

According to Dr. Geier, "[e]ndotoxin is a poison which is contained primarily in gram negative bacteria. It's one of the most feared toxins in the world of medicine." Tr. at 104. Dr. Geier further explained:

The term endotoxin is used to denote a poison that is not normally released from the cell. It's part of the cell wall. The opposite term would be exotoxin, a poison that bacteria secrete. Endotoxin is not part of the disease pertussis. Pertussis is caused primarily by exotoxins. It is a part of the [DPT] vaccine because the vaccine uses the whole cell so when we inject the cell walls, we're injecting endotoxin.

Tr. at 105.

In his study of the levels of endotoxins in commercial vaccines, published in Applied and Environmental Microbiology in 1978, Dr. Geier found that

DPT was the only vaccine that was in general use that had the amount of endotoxin that we were detecting. In fact, it had so much endotoxin that you [could] dilute it a million to one in some cases and still detect endotoxin.

Tr. at 106.

The effects of endotoxin are sometimes benign. According to Dr. Geier, "[v]irtually everybody that gets exposed to endotoxin gets a fever."[17] Tr. at 106. In addition, for some people, exposure to endotoxin can produce changes in the ability of blood to coagulate (clot). Id. Dr. Geier referred to a study performed by Sheldon Wolfe at the National Institutes of Health in which two nanograms of endotoxin per kilogram of

---

George Washington University. Between 1974 and 1978, he was on the professional staff of the laboratory of general and comparative biochemistry at the National Institutes of Health and researched, among other things, the effect of bacterial molecules on higher organisms, especially humans. Tr. at 98–99. Dr. Geier completed an internship and residency at the Johns Hopkins University Hospital. Among other positions he has held, Dr. Geier has been an assistant professor in the Department of Gynecology and Obstetrics at the Johns Hopkins School of Medicine. Tr. at 99–100; Ex. 9.

16. Dr. Geier attributes no significance to the fact that Richie's APGAR scores of 4 and 7 were in the "medium" range. Although children whose scores are in that range are perhaps more likely to experience subsequent problems than those whose scores are high (8–10), the first two months of Richie's life did not evidence any neurological or other problems.

17. Dr. Geier attributes the fact that Richie did not become febrile to the fact that "[p]eople in shock can't mount a fever response and they tend to be cold and clammy." Tr. at 126.

body weight were injected into volunteers. In all cases, a fever resulted and some individuals demonstrated significant blood-clotting deficiencies. Such deficiencies could be detected at the clinical level by easy bruising, bleeding into the gastroin-. testinal tract and disseminated intravascular coagulopathy "which means basically all your clotting factors are gone [and] ... you can bleed virtually any place." Tr. at 107.

According to Dr. Geier, other manifestations of endotoxic shock include "loss of blood pressure, loss of infusion to the lungs, eventually cardiac arrest and pulmonary failure, sometimes with evidence of coagulopathy." Tr. at 108. Once it has begun, endotoxic shock is very hard to arrest. Even with antibiotics, approximately 30 percent of people suffering from its effects will die anyway. Tr. at 108–109.

Dr. Geier testified that it is very clear from the history that Richie suffered hypotonic hyporesponsive collapse following the administration of the DPT vaccine in question. Tr. at 135. Dr. Geier further explained that endotoxic shock is a "subset of hyporesponsive shock." Tr. at 125. The symptoms that Richie displayed "strongly argue in favor of" the conclusion that Richie suffered hyporesponsive shock. According to Dr. Geier:

> He has considerable evidence of blood coagulation problems. He has a bruised spot or a blood clot spot on his face. He has a leg that has a progression of bruise marks which is evidence that he's not clotting properly.
>
> I think he actually falls into what in animal research terms would be called a Schwartzman reaction. We don't study in humans Schwartzman reactions because it's studied by giving an animal [a] lethal dose of endotoxin.
>
> ... [I]n animals if you give large amounts of endotoxin they go into [hypo]responsive hypotensive shock and they also have bleeding into various parts of the body and I think we are seeing evidence of that in Richie.

Tr. at 125–126.

Evidence of coagulatopathy problems in Richie included both the spot on Richie's nose (ecchymosis) noticed by his mother and the bruise-like marks extending down Richie's leg, that likely were not caused by the trauma of the needle. Tr. at 128. Dr. Geier reports that it is widely accepted that the endotoxin contained in DPT vaccines causes these blood clotting problems in certain individuals. Tr. at 129.

As to the autopsy report of congestion and edema of the lungs and the brain, the described symptoms would be compatible with death due to DPT vaccination. The swelling of the brain would be consistent with increased intracranial pressure. Tr. at 141. See § 300aa–14(b)(3)(A). According to Dr. Geier, nothing in the autopsy report is inconsistent with death from shock collapse. Moreover, the autopsy's findings would be "very inconsistent" with death due to dehydration. Tr. at 142. If Richie had died from shock due to dehydration, one would expect to find a sunken fontanel and small brain, not swelling of the brain. Tr. at 142.

> In fact, ... if a pediatrician is interested in whether a child is dehydrated ... they feel the [anterior] fontanel and if it's depressed, meaning the brain is shrinking away, then that's strong evidence of dehydration.

Tr. at 142. As to the finding of hyperplasia of the thymus, Dr. Geier reports that there are a number of reasons why that finding is not surprising:

> One is that one of the other poisons in DPT is called pertussis toxin and it causes an increase in white cells and stimulation of white cells can cause hyperplasia of the thymus, the thymus being an area where T cells are being produced.

Tr. at 143. Moreover, according to Dr. Geier, there is no evidence in the record that would suggest that Richie's encephalopathy was caused by toxins (other than endotoxins and pertussis toxins contained in the vaccine), trauma, infection or metabolic disturbances. See § 300aa–14(b)(3)(B).

With respect to the HHS report's theory that Richie died of dehydration, Dr. Geier stated as follows:

I think the edema of the brain argues against that and I think the history of this child drinking almost up until time that it expired and the fact that this child's fluid loss was in one episode of a significant amount of diarrhea and a couple of very small other episodes make[s] that diagnosis untenable.

Tr. at 145. More importantly, it would appear, according to Dr. Geier, that HHS made its determination based upon an erroneous assumption. HHS assumed that Richie lost two pounds nine ounces (22 percent of his body weight) in a period of 33 hours before his death. He actually only lost 13 ounces (approximately 7 percent of his body weight), which is "insignificant." Tr. at 146–147. Some of the actual weight loss is attributable to the fact that corpses naturally dehydrate after death.

I think the generally discussed thing is that bodies lose about five percent per day as they sit around.... It may well be that this child only lost two percent but even the seven percent is not the kind of dehydration that causes death.

Tr. at 147.

When asked what Richie's weight loss might have been attributable to, Dr. Geier responded:

I would suspect that about half of it was due to the fact that the child was dead for some time before it was weighed and the other part may be due to that bit of diarrhea, which incidentally may have very well been caused by two things—one is shock. People that go into shock often get diarrhea.

The other is that endotoxin and the effects it has on blood clotting can affect stool production. The animals that die of the Schwartzman reaction very often have diarrhea.

Tr. at 149.

## II.

### THE STATUTORY REQUIREMENTS

Section 300aa–13(a)(1) of the Vaccine Act provides that compensation shall be awarded to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

In turn, under § 11(c)(1), a petitioner can establish entitlement to an award by demonstrating that the vaccine recipient in question—

(A) received a vaccine set forth in the Vaccine Injury Table ...

\*　　\*　　\*　　\*　　\*　　\*

(B)(i)(I) received the vaccine in the United States or in its trust territories,

\*　　\*　　.\*　　\*　　\*　　\*

(C)(i) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in sub-paragraph (A) ... and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table,

\*　　\*　　\*　　\*　　\*　　\*

(D)(ii) died from the administration of the vaccine, and

(E) has not previously collected an award or settlement of a civil action for damages for such vaccine injury or death.

300aa–11(c)(1).

The above-mentioned Vaccine Injury Table (hereinafter "Table") lists certain injuries and conditions which, if found to occur within a prescribed time period, create a rebuttable presumption that the vaccine caused the injury or condition. § 300aa–14(a).

In this case, petitioner contends that Richie Ciotoli suffered a shock collapse or hypotonic-hyporesponsive collapse and an encephalopathy within 3 days of receiving a

DPT vaccine and died as a result of such injuries. Tr. at 125, 128.

Shock collapse or hypotonic-hyporesponsive collapse (hereafter "shock collapse") and encephalopathy are both injuries or conditions listed in the Vaccine Table. If the shock collapse or encephalopathy occurs within 3 days of the administration of the vaccine and thereafter "any acute complication or sequela (including death)" of the shock collapse or encephalopathy occurs, then a rebuttable presumption of causation is found. *See* §§ 300aa–14(a)(I)(C) and (E).

In order to find a preponderance of the evidence, the trier of fact must "believe that the existence of a fact is more probable than its nonexistence before [the special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harland, J., concurring), *quoting* F. James, Civil Procedure 250–251 (1965). Mere conjecture or speculation will not establish a probability. *Snowbank Enter. v. United States*, 6 Cl.Ct. 476, 486 (1984).

■ Upon establishing by a preponderance of evidence that a Table injury occurred, the burden of proof then shifts to the respondent to show that the death is "due to factors unrelated to the administration of the vaccine described in the petition." § 300aa–13(a)(1)(B). Such factors do not include "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition." § 300aa–13(a)(2)(A). Therefore, if respondent cannot show an alternative cause by a preponderance of the evidence, "the encephalopathy shall be considered to be a condition set forth in the table." § 300aa–14(b)(3)(B).

## III.

### FULFILLMENT OF THE STATUTORY REQUIREMENTS

■ For the reasons set forth herein, the undersigned finds that the evidence presented by petitioner demonstrates by a preponderance of the evidence that Richie Ciotoli suffered a shock collapse and an encephalopathy within 3 days of the administration of the DPT vaccine and died as the result of such shock collapse and encephalopathy. Additionally, the record does not show by a preponderance of the evidence that Richie's death was due to factors unrelated to the administration of the vaccine.

*Received a vaccine set forth in the Vaccine Injury Table.*

Richie Ciotoli was administered a DPT vaccination on January 12, 1983. Since the DPT vaccine is listed on the Vaccine Injury Table, this fulfills the requirement of part (A) of § 300aa–11(c)(1). Tr. at Tr. at 55; Ex. 2 at 6.

*Received the vaccine in the United States.*

Richie Ciotoli was administered a DPT vaccination in the United States, specifically in Binghampton, New York, thus satisfying § 300aa–11(c)(1)(B). *See* Affidavit of Janet Ciotoli, attached as Exhibit A to Amended Petition for Vaccine Compensation, *Ciotoli v. Secretary of Health and Human Services*, No. 88–59V (Cl.Ct.), filed July 14, 1989.

*Has not previously collected an award or settlement.*

Neither Mr. or Mrs. Ciotoli has previously collected an award or settlement of a civil action for damages for the death of Richie Ciotoli. § 300aa–11(c)(1)(E). Tr. at 165.

*Sustained a Table injury.*

The undersigned finds that petitioner has demonstrated by a preponderance of the evidence that Richie suffered a shock collapse and encephalopathy within three days of the administration of a DPT vaccine. The following evidence forms the basis for such conclusion: (1) the testimony of petitioner's medical expert, Dr. Mark Geier; (2) the consistency of the symptoms described with the statutory definitions of shock collapse and encephalopathy; (3) the supplemental death certificate noting probable reaction to D.P.T. leading to irreversible

shock; and (4) Dr. Doniger's report to the Center for Disease Control describing the diagnosis of Richie's death as vaccine-associated shock leading to cardiopulmonary arrest.

*Statutory guidance.*

The Vaccine Act sets forth certain "aids to interpretation" as a complement to the Vaccine Injury Table. As to the diagnosis of a shock collapse, the act offers the following facilitating interpretation:

> A shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete[) ], hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

§ 300aa–14(b)(1).

The Vaccine Act defines "encephalopathy" as follows:

> The term "encephalopathy" means any significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy.

§ 300aa–14(b)(3)(A).

Dr. Geier testified that Richie exhibited all but two of the symptoms describing shock collapse listed in the Vaccine Act's aids to interpretation.[18] Tr. at 136–37. *See*

§ 300aa–14(b)(1). According to Dr. Geier, Mrs. Ciotoli's description of Richie as limp and rag doll-like and difficult to arouse are consistent with a diagnosis of shock collapse. Tr. at 128. He exhibited a decrease or loss of muscle tone in his rag doll-like and floppy appearance. He was unresponsive to his environment as reflected in Mrs. Ciotoli's inability to keep him awake while feeding him. He exhibited prolonged sleeping with difficulty arousing. Finally, he experienced cardiovascular and respiratory arrest. Tr. at 136–37.

While a majority of children who suffer from shock collapse recover, the literature has reported instances in which such children have died. Tr. at 134–135. It is Dr. Geier's opinion that part of the reason Richie didn't recover from shock collapse was that he was also damaged neurologically. Tr. at 138. According to Dr. Geier, the record contains evidence that Richie exhibited the symptoms of encephalopathy. *See* § 300aa–14(b)(3)(A). The "cat howl" cry that Mrs. Ciotoli described is a "a classical description of an encephalopathic's cries." Tr. at 138. Further, his cry was described as unconsolable. Diffuse neurological signs may have been present in what Mrs. Ciotoli described as Richie's "staring" behavior, when he refused to make eye contact and stared at the ceiling. These episodes may have been petit mal seizures, according to Dr. Geier. Tr. at 139. Richie also exhibited changes in level of consciousness.

Finally, both the Broome County coroner and the Broome County Deputy Commissioner of Health ascribed Richie's death to a vaccine reaction.

The undersigned finds that the petitioner has presented evidence which establishes by a preponderance of the evidence that Richie suffered a shock collapse and encephalopathy within 3 days of the administration of the DPT vaccine on January 12, 1983.

---

**18.** Dr. Geier was unable to say whether Richie exhibited any symptoms compatible with paralysis, or whether he exhibited changes in color.

*Died from the administration of the vaccine.*

While death may not be the ordinary sequela of a shock-collapse or encephalopathy, Dr. Geier has testified that the facts presented here lead him to conclude that Richie died as the result of such injuries. The Vaccine Act permits compensation for "any acute complication or sequela (including death)" of shock collapse or encephalopathy. § 300aa–14(a)(I)(E). When read in conjunction with the Table, this statutory requirement is satisfied by showing that a shock-collapse and/or encephalopathy occurred within 3 days of the administration of the DPT vaccine, and that an acute complication or death followed such injuries. In this case, the shock-collapse, encephalopathy and death all occurred within 33 hours of the administration of the vaccine, thus satisfying the requirements of § 300aa–11(c)(1)(D)(ii).

*Possible alternative causation.*

While the HHS report posits that Richie died from dehydration, such conclusion was based upon a faulty assumption, *viz.* that Richie lost two pounds nine ounces, or 22 percent of his body weight, in the 33 hour period between the administration of the vaccine and his death. In fact, Richie only lost approximately 13 ounces, approximately 7 percent of his body weight, an amount considered by Dr. Geier to be insignificant considering the fact that a certain amount of the weight loss is attributable to the time lapse between death and autopsy.

Additionally, if Richie had been dehydrated, according to Dr. Geier, the pathologist should have been able to find symptomatic evidence during the autopsy. The autopsy report makes no note of any sign of dehydration, nor does it raise the possibility of dehydration as the cause of death. Moreover, the autopsy's findings of cerebral edema are inconsistent with death due to dehydration, which, according to Dr. Geier, would produce a shrunken, not edematous, brain.

Given the error of HHS in forming its conclusions and the absence of other evidence as to a possible alternative cause of death, the undersigned is convinced that a preponderance of the evidence does not suggest that Richie's death was due to factors unrelated to the administration of the vaccine.

## IV.

## ATTORNEYS' FEES AND COSTS

The Vaccine Act provides that a judgment on a petition awarding compensation under the Act shall include an amount to cover reasonable attorneys' fees and other costs. § 300aa–15(e). Petitioner may also recover attorneys' fees and costs incurred in a prior civil action. § 300aa–15(e)(2). This court has determined that the appropriate method for computation of attorneys' fees awarded under the Act is the "lodestar" model. *See Gregson v. Secretary of the Dept. of Health and Human Services*, No. 88–1V, slip op. at 7 (Cl.Ct., April 24, 1989). The lodestar is the product of the reasonable hours expended times a reasonable hourly rate. The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

The fee applicant carries the burden of proof. To meet such burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As the Claims Court in *Martin v. United States* wrote:

> A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.

*Martin v. United States*, 12 Cl.Ct. 223, 227 (1987), *citing, Hensley v. Eckerhart*, 461 U.S. at 429, 433, 441, 103 S.Ct. at 1937, 1939, 1943.

Counsel for petitioner has submitted a petition for attorneys' fees and costs which consists of the following time and expenses: [19]

### Legal Time Charges

| Name | | | | |
|---|---|---|---|---|
| Anthony Colantoni | Partner | $290.00 | 69.6 | $20,184.00 |
| Julie Isenberger | Paralegal | 40.00 | 10.95 | 438.00 |
| Total | | | | $20,622.00 |
| Expenses | | | | $ 5,292.55 |
| Total Fees and Expenses | | | | $25,914.55 |

See Petitioner's Supplemental Memorandum of Attorneys' Fees and Expenses, *Ciotoli v. Secretary of the Department of Health and Human Services*, No. 88–59V (Cl.Ct.) (filed Sept. 26, 1989) (hereafter "Supp. Petition").

*Reasonable hourly rate.*

■ In calculating a reasonable hourly rate a court must consider "the prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). The Supreme Court noted in *Blum* that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult." *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. In discussing the applicant's burden, the Court stated that:

> To inform and assist the court in the exercise of its discretion [to award fees], the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

*Id.* at 895 n. 11, 104 S.Ct. at 1547 n. 11. Proof of prevailing market rates may be demonstrated in a number of ways, including:

(1) Affidavits of other attorneys or experts;

(2) Citations to prior precedents showing reasonable rate adjudications for the fee applicant, for comparable attorneys, or for comparable cases;

(3) References to fee award studies showing reasonable rates charged or awarded in the relevant community;

(4) Testimony of experts or of other attorneys in the relevant community;

(5) Discovery rates charged by the opposing party; and

(6) Reliance on court's own expertise to recognize applicable prevailing rates.

Newberg, ATTORNEY FEE AWARDS 198 (1986).

■ Petitioner's attorney, Anthony Colantoni, claims a rate of $290.00 per hour. Mr. Colantoni is a partner in a small Chicago law firm, McDowell and Colantoni, Ltd., which specializes in litigation and has represented over five hundred families of victims of vaccine injury in the last ten years. Fee Petition at 3. Counsel notes that "[a]s a litigation firm which represents victims of vaccine injury, ninety-five percent of all revenues generated have been on the basis of contingent fee contracts." Fee Petition at 4.

---

19. Originally, petitioner requested $5,689.23 in costs (including paralegal expenses) and $19,894.00 in attorneys' fees. *See,* Petitioner's Memorandum of Costs and Fees at 1, 4 (filed Aug. 7, 1989) (hereafter "Fee Petition"). At the request of the special master, petitioner's counsel then submitted additional documentation in support of that application. In the supplemental petition, counsel included hours expended since the filing of the initial application and calculated paralegal costs in the fee request rather than as an expense.

Counsel's claimed rate is thus based not on fees customarily charged by Mr. Colantoni or his law firm for similar services, but on other factors. These include: (1) counsel's expertise in the field of vaccine litigation; (2) his activity in the American Trial Lawyer's Association's DPT litigation group; (3) counsel's assistance in the drafting of the Vaccine Act; (4) membership on the Advisory Commission to the Secretary of Health and Human Services on Childhood Immunizations; (5) risk of recovery of fees; and (6) the necessity of carrying expenses for a long period of time. *See* Fee Petition at 3–4; Supp. Pet. at 1–2. In justifying $290.00 per hour, counsel further notes that hourly rates for attorneys in Chicago range from $125.00 to $325.00 for partners and principals. Supp. Petition at 1, *citing*, The Lawyers Almanac 1989 at 116.

Finally, in support of his application for fees and costs, petitioner's counsel submits an affidavit from Robert J. Glenn, a member of the Illinois bar, who affirms that $290.00 per hour is a "reasonable rate relative to the expertise and experience of counsel, the range of hourly rates in the Chicago area, the nature of the work performed and the time lag between time spent and expenses incurred and payment." Supp. Petition, Ex. 1.

■ Under the Vaccine Act, the determination of a "market rate" in a particular case is made by the court without the benefit of negotiation between attorney and client. The amount awarded is exclusive; no additional fees may be charged by the attorney. § 300aa–15(e)(3). Counsel is correct in looking to the market range of rates in other Chicago-based firms to justify his claim. Nonetheless, that is simply the starting place. Where, as counsel here claims, the upper end of that range is purported to be reasonable, and the determination of a market rate, or what a client would be willing to pay for Mr. Colantoni's services, must be made without the benefit of historical billing practices, something else must support the claimed rate.

In that regard, counsel's allegations of his firm's role in DPT litigation are of scant probative value. What is central is the knowledge and expertise of a given attorney performing given work in a given case. In exploring that issue, the affidavit of Mr. Glenn is no more enlightening, as it too fails to discuss the knowledge or skill of Mr. Colantoni as applied in particular to cases filed under the Vaccine Act. As the applicant in this instance bears the burden of proof, "generalized and conclusory 'information and belief' affidavits from friendly attorneys" will not suffice. *Nat'l. Assoc. of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1325 (D.C. Cir.1982). Mr. Glenn's affidavit does not rise to the level of detail necessary to reinforce a determination that an hourly rate of $290.00 is reasonable in this particular case.

Moreover, to justify top dollar, not only must counsel demonstrate that he is skilled in the area, he must also produce evidence that those skills are essential in providing the *services* necessary in the case in question. *See Blum*, 465 U.S. at 895, 104 S.Ct. at 1547. In other words, Mr. Colantoni must bring forth a least some credible evidence suggesting that the services rendered, due to the complexity of issues involved or other salient factors, warrant the skills of an attorney commanding an hourly rate of $290.00. In the context of the Vaccine Act, such a nexus would be difficult to prove.

The Act provides an alternative to traditional tort litigation for those claiming vaccine-related injury or death. *See § 300aa–10(a). Through the Vaccine Injury Table, the Act drastically reduces the difficult burden of causation and negligence formerly faced by vaccine litigants. By design, the Act was*

intended to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation of injury and without a demonstration that a manufacturer was negligent or that a vaccine was defective.

H.R.Rep. No. 908, 99th Cong. 2d Sess., pt. 1, at 12, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6353; *see also*, 300aa–11(c)(1)(C)(i) and 300aa–13(a)(1).

Particularly in a case such as this, where the petitioner has claimed an "on the table injury," few issues would be complex enough to warrant a top hourly rate. Petitioner's counsel has pointed to no such complexities. In short, counsel has failed to carry his burden of demonstrating that a rate of $290.00 per hour is consonant with the fees charged in the relevant community for services of similar complexity and difficulty.

As counsel has not satisfied his burden, a reasonable fee must be established upon a plenary review of the facts. The special master notes that Mr. Colantoni has been well prepared throughout the proceedings, his participation in all aspects of the case has been professional and competent, and his conduct of the evidentiary hearing was effective in creating a clear and complete record. As he notes in his fee applications, Mr. Colantoni's membership on the Advisory Commission on Childhood Immunizations to the Secretary of Health and Human Services and his expertise in the medical issues of DPT litigation reinforce his claimed proficiency in the subject matter. Finally, it must be acknowledged that the market rate in the Chicago area is relatively high.

■ For the foregoing reasons, the undersigned concludes that an hourly rate of $225.00 is fair, reasonable, and provides adequate compensation for the particular services provided by Mr. Colantoni in this case. In addition, the rate of $40.00 per hour for paralegal time is also reasonable.[20]

*Reasonable hours expended.*

■ To demonstrate "reasonable hours" worked, the applicant should provide contemporaneous time records and a personal affidavit in support of the fee petition.

*Grendel's Den v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984) (failure to keep records can result in a drastic reduction of fees). In reporting time expended, the applicant need not account for every minute. However, "at least counsel should identify the general subject matter of his time expenditures." *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12. Once counsel appropriately identifies his time, the number of reasonable hours, those hours which reflect "excessive, redundant, otherwise unnecessary" hours must be excluded by the court. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40. In requesting statutory fees, an attorney must use the same "billing judgment" as an attorney would in billing a client. "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940 (emphasis in original).

■ Counsel's Supplemental Memorandum included a computer printout documenting in detail all but 8.8 hours of time. Mr. Colantoni asserts that those 8.8 hours are an estimation of hours spent before counsel began keeping contemporaneous time records in this case. According to Mr. Colantoni's petition, these hours are attributable to initial review and consultation with the petitioner. Supp. Petition at 2. Without better documentation, however, such hours appear excessive, and accordingly are reduced to 4.0 hours.[21] Discounting the 4.8 hours deemed excessive, Mr. Colantoni's reasonable hours total 64.8. The 10.95 hours claimed for paralegal assistance, all well-documented, appear reasonable. *See* Supp. Petition, Ex. 2 at 2.

Accordingly, the special master recommends a finding that reasonable attorneys' fees should be awarded as follows:

---

**20.** There appears to be a typographical error with regard to paralegal fees in the original Fee Petition. While paralegal costs are stated to be itemized at $45.00 per hour, the claimed paralegal fee of $438.00 divided by 10.95 hours actually equals $40.00 per hour. *See* Fee Petition at 1. The $40.00 figure is supported by the Supplemental Memorandum, in which it is stated that the paralegal rate is $40.00 per hour. Supp. Petition at 2.

**21.** The undersigned also notes that the number of hours spent in hearing preparation and review of material before a three hour hearing appear somewhat excessive as well. *See* Supp. Petition, Ex. 2, 7/13/89–7/25/89 (over 36 hours of which could fairly be construed as hearing preparation—20 of those in one day). However, given counsel's competent presentation of the hearing witnesses, this special master is inclined to allow those hours.

| Anthony Colantoni | 64.8 hours at $225/hr.= | $14,580.00 |
|---|---|---|
| Julie Isenberger | 10.95 hours at $ 40/hr.= | 438.00 |
| | Total Fees | $15,018.00 |

*Costs.*

In reviewing expenses claimed, all of Mr. Colantoni's reported costs appear fair and reasonable. All are satisfactorily documented and reflect only expenses, such as court costs, travel expenses, postage, etc. which are a direct incidence of litigation. *See* Supp. Petition, Ex. 3. Therefore, it is recommended that petitioner be awarded costs of $5,292.55.

Accordingly, the undersigned recommends a total award of $20,310.55 in attorneys' fees and costs.

### V.

### AMOUNT OF THE AWARD

(1) *Award in the case of death.*

An amount of $250,000 is clearly mandated by the Vaccine Act which states that an award shall include "[i]n the event of a vaccine-related death, an award of $250,000 for the estate of the deceased." § 300aa–15(a)(2).

(2) *Attorneys' fees and costs.*

The second element, authorized by § 300aa–15(e), is an award for attorneys' fees and costs. As stated above, it is recommended that an amount of $15,018.00 be awarded for attorneys' fees and that an amount of $5,292.55 be awarded for costs. Thus, the total amount recommended for attorneys' fees and costs is $20,310.55.

### VI.

### ULTIMATE FINDINGS OF FACT

(1) Richie Ciotoli was administered a DPT vaccine on January 12, 1983.

(2) The vaccine was administered in the United States.

(3) Richie Ciotoli suffered a shock-collapse or hypotonic-hyporesponsive collapse and encephalopathy within three days of the administration of the vaccine.

(4) Richie Ciotoli died from the administration of the vaccine.

(5) Neither the estate of Richie Ciotoli nor his parents has previously collected an award or settlement of a civil action for damages for the vaccine-related death of Richie Ciotoli.

### VII.

### CONCLUSIONS OF LAW

(1) The petition was timely filed.

(2) A preponderance of the evidence supports the conclusion that Richie Ciotoli died as a result of the administration of the DPT vaccine on January 12, 1983, and the petitioner is thus entitled to compensation under the Act.[22]

(3) There is not a preponderance of evidence that Richie's death was due to factors unrelated to the administration of the vaccine.

(4) The statutory compensation amount of $250,000 should be awarded in this case.

(5) Reasonable attorneys' fees and costs should be awarded in the amount of $20,310.55.

(6) Judgment should be entered for the petitioner in the amount of $270,310.55.

IT IS SO RECOMMENDED.

---

22. It should also be noted that pursuant to § 11(b)(1)(A) under the general description of "petitioners," that where the vaccine recipient has died, the petitioner must show himself or herself to be the "legal representative" of that recipient. Here, petitioner has made such a showing. *See* Ex. 6.