Edith THORNTON, Petitioner,

v.

**SECRETARY OF the DEPT. OF HEALTH AND HUMAN SER-VICES, Respondent.**

No. 90–2971 V.

United States Court of Federal Claims.

March 1, 1996.

Edith Thornton, Augusta, GA, pro se.

Victoria Leigh Ott, Vaccine/Torts Branch, Civil Division, Department of Justice, Washington, D.C., attorney of record, for respondent.

## OPINION

HORN, Judge.

The above captioned case is before this court on petitioner's motion for review of the special master's decision denying compensation to the petitioner. Edith Thornton initially filed her petition for compensation under the Vaccine Program, 42 U.S.C. §§ 300aa–11, *et seq.* (Supp.1995), on October 1, 1990.[1] The complaint was signed and filed for petitioner by Samuel F. MaGuire of Augusta, Georgia, who represented petitioner at the time.[2] Ms. Thornton's claim was dismissed by the special master in an order dated June 2, 1995. Judgment was entered on July 5, 1995, but vacated on August 7, 1995, in order to permit review of the special master's decision. In her original petition, Ms. Thornton claimed that she had sustained serious injury as a result of the administration of a polio vaccine, Monovalent Sabin # 1, on May 19, 1963, in Beaufort, South Carolina. Petitioner also alleged that the vaccine caused paralysis, followed by crippling and debilitating pain, which has adversely affected her health and employability. Respon-

dent requested dismissal of the case and noted the absence of documentation demonstrating that the vaccine had been administered. Moreover, defendant claimed that there was no evidence in the record, aside from her own testimony, that Ms. Thornton suffered from polio.

A first evidentiary hearing was held on July 21, 1993, in Arlington, Virginia, before Chief Special Master Gary J. Golkiewicz, at which Ms. Thornton represented herself. At the July 21, 1993 hearing, petitioner's medical expert, Dr. Rita Udom, testified by telephone. Approximately fourteen months later, on March 28, 1995, after submission of documents and briefs, a second evidentiary hearing was held in College Park, Georgia. At the second hearing on March 28, 1995, Ms. Thornton personally appeared and was represented by A. Leroy Toliver of Atlanta, Georgia. At the hearing on March 28, 1995, testimony was elicited from Ms. Thornton, her son Joseph Thornton, Michael Cohen, M.D., and Robert H. Parrott, M.D., the government's medical expert witness.

Although the petitioner offered affidavits and oral testimony in support of her claim, the information provided is contradictory. In her initial affidavit, dated September 24, 1990, Ms. Thornton stated that in 1963 she took Monovalent Sabin # 1, administered by a Dr. Parker Jones. Dr. Jones, however, is no longer practicing medicine and has destroyed all of his medical records. Ms. Thornton stated in her first affidavit that "[a]lmost immediately, I started feeling bad." She enumerated her symptoms as follows:

---

1. Tit. XXI, § 2112, as added Nov. 14, 1986, Pub.L. No. 99–660, tit. III, § 311(a), 100 stat. 3761; Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224 and amended Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224, Pub.L. No. 100–203, tit. IV, §§ 4307(3)(c), 4308, as amended and added July 1, 1988, Pub.L. No. 100–360, tit. IV, § 411(o)(2), (3)(A), 102 Stat. 808; Dec. 19, 1989, Pub.L. No. 101–239, tit. IV, § 6601(d)–(i), 103 Stat. 2286–2290; Nov. 3, 1990, Pub.L. No. 101–502, § 5(b), 104 Stat. 1286; Nov. 26, 1991, Pub.L. 102–168, tit. II, § 201, 105 Stat. 1102; Oct. 27, 1992, Pub.L. 102–531, tit. III, § 314, 106 Stat. 3508; June 10, 1993, Pub.L. 103–43, tit. XX, § 2012, 107 Stat. 312; Aug. 10, 1993, Pub.L.

103–66, tit. IV, § 13632, 107 Stat. 312; Dec. 14, 1993, Pub.L. 103–183, tit. VII, § 708.

2. Ms. Thornton has been represented by three separate counsel at various times throughout the proceedings, including when the original petition was filed. First she was represented by Samuel MaGuire, from September 24, 1990, at least until February 28, 1991, the date of the last filing bearing his name. Next, petitioner was represented by Joseph Neal, from June 28, 1991, at least until July 6, 1992, the date of the last filing bearing his name. A. Leroy Toliver took over the case on November 30, 1994. On June 30, 1995, Mr. Toliver informed petitioner that he would do no further work on her case.

Started with general bodily discomfort; Paralyzed from the neck down; Right arm locked to one side; Legs bending backwards; All-over body, muscle and leg pain; Inability to move; Inability to walk; Wrists locked up and wouldn't move; Ankles swelled; Legs crippled; Hands would lock up and freeze and I couldn't move them to ring the registers.

In her oral testimony, she stated:

within a week later, I started feeling bad. I was typing and my arm locked to my side and so the doctor gave me some medication. I went home and within a few days or a week, it passed and then I sort of paralyzed from the neck down. It lasted probably a week, give or take a day ...

Subsequently, on March 14, 1991, Ms. Thornton submitted a second affidavit in which she stated that after receiving the vaccination on May 19, 1963, "she did not feel well and ran a fever," that day and for a couple of days thereafter. According to petitioner, within three to seven days, she "experienced paralysis of her arms and severe pain throughout her body." Petitioner also stated that "the complete paralysis abated, but her life has been plagued by crippling and debilitating pain."

In her third affidavit, dated March 23, 1992, Ms. Thornton stated that she received a series of polio vaccinations in 1963, with the first being type 1 OPV, received on May 19, 1963. Although Ms. Thornton distinctly remembers her first vaccination on May 19, 1963, at the Beauford Elementary School, she cannot recall the dates of her second and third polio vaccines, which she claims were administered at Dr. Jones's office. In the third affidavit, Ms. Thornton used a different time frame and stated that "[a]pproximately *three* weeks following the series of polio vaccines, I became paralyzed from the neck down, starting with the paralysis of my left arm and progressing to total paralysis of my body." (Emphasis added.)

To try to establish the dates of the oral polio vaccine given in Ms. Thornton's local community, petitioner also offered an affidavit from Rosemarie L. Shelley, a nurse with the local health department, who remembers the vaccination being given on May 19, 1963.

The affidavit of Ms. Shelley further stated that type 3 vaccine was given on October 20, 1963 and the third, type 2, on December 8, 1963. These dates are verified by Ms. Shelley's vaccination record. Additionally, petitioner offered the affidavit testimony of Ms. Mary Bowers Starr, who stated that she was waiting on line with Ms. Thornton in 1963 when the OPV type 1 vaccine was given to petitioner, and that it was Dr. Jones who administered the Monovalent Sabin #1 on a sugar cube.

The medical records in this case also contain two medical histories, one from Dr. Cohen, a rheumatologist, who treated Ms. Thornton between 1980 and 1982, and one from Dr. Wolf, a neurologist, who examined her in 1991. In a letter dated October 22, 1982, Dr. Cohen notes that he was following Ms. Thornton for rheumatoid arthritis, which was first diagnosed in the late 1960's. Dr. Cohen's treatment of Ms. Thornton involved two hospitalizations as a result of "recurrent flares" of her arthritis. The recorded medical histories on the occasion of the two hospitalizations, one in 1980 and one in 1982, describe Ms. Thornton's arthritic problems and recite petitioner's assertions of the paralysis petitioner reported she had suffered after she received a vaccine in 1963. The medical history for the first hospitalization, in November 1980, indicates that the paralysis "resolved after some eighteen months."

Dr. Wolf saw Ms. Thornton in 1991, after she filed her petition for compensation under the Vaccine Program. Dr. Wolf performed a neurological evaluation, which included reviewing the medical records, the polio serology and the Electromyography (EMG) performed in 1991. Dr. Wolf concluded his report with a section titled "impression." The impression section includes the following observations by Dr. Wolf: (1) "Polyneuropathy. The process is mild." He also stated, however, that he was "uncertain as to whether the patient has any symptoms related to the polyneuropathy;" (2) "past history of 'paralysis'", which he concluded was not suggestive of Guillian–Barre syndrome or myelopathy, and that "[t]he patient appears to have a prominent rheumatological process", and; (3) "Arthritis," under

which he concluded that most of Ms. Thornton's symptoms are related to her inflammatory deforming arthritis.

Ms. Thornton presented the live telephone testimony of Dr. Rita Udom as her medical expert. Dr. Udom specializes in family medicine and is board eligible in emergency medicine. She, however, has very limited experience with polio. Moreover, the record reflects confusing and conflicting letters, affidavits and testimony submitted by Dr. Udom. Dr. Udom concluded in her initial affidavit, dated January 12, 1993, that Ms. Thornton was suffering from severe disabling polyneuropathy, associated with muscular weakness, muscular wasting and sensory loss. In that affidavit, Dr. Udom also stated that Ms. Thornton "fits the differential diagnosis for Guillian–Barre Syndrome."

In a letter submitted on April 2, 1993, Dr. Udom, however, concluded that Ms. Thornton suffered from paralytic polio, based upon seropositive testing, the description of her paralysis, and her present clinical condition. Subsequently, on July 21, 1993, Dr. Udom testified at the hearing that the opinion in the April 2, 1993 letter was not inconsistent with the conclusions included in her first affidavit, in which she had identified Guillian–Barre syndrome as the source of petitioner's difficulties. The following colloquy occurred:

Q [Government Counsel] Okay. All right. And now you—and then subsequently to that, you submitted a letter—or actually an affidavit, dated April 2, 1993, in which you state your—it is your opinion that Ms. Thornton has suffered from polio in the past.

A [Dr. Udom] Yes, ma'am.

Q Okay. And could you explain what caused you to change your opinion from the first letter?

A I didn't really change my opinion. I told her that, you know, for me to include that polio was the cause of all—you know, all of her symptoms and her problems, I wanted to see the titer that were done, the polio titer that were done. And when I saw that—I mean, there was no question in my mind, but I told her that I had to have some kind of facts or documentation.

Q Okay. Now would you say that positive polio titer is automatically evidence that her condition was caused by polio?

A With the polio vaccine, her titer were very elevated; yes, ma'am.

Q Can you say that—so you wouldn't say that that—those elevated titer necessarily mean that her polio was vaccine related.

A When you have a level that high, it shows someone who, you know, probably got a vaccine and subsequently succumbed to the illness; yes, ma'am.

Q Okay. And what—why do you have that opinion?

A Because of the—her serum positive, how high. You know, this is consistent with, you know, the serum positivity, the test that I have, and you probably have the results.

Q Okay. So, you mean once you reach a certain level of titer, that means the polio was vaccine induced as opposed to wild-strain polio?

A Well, it's, you know, hard—difficult to tell that.

Q Okay. So, you—

A It's hard to tell.

Q Okay. So is it your opinion, then, that she has polio—or she had had polio?

A Ma'am, it is.

Q Okay. But, you can't say whether that polio was vaccine induced more likely than it was caused by a wild-strain; can you?

A You can, if you follow her, you know, the—in her—the way she—when she received the vaccine and then subsequent illness. I mean, it's, you know, it follows the pattern.

Q Just saying based on the titer, itself?

A Yes, ma'am.

Q So the titer alone don't indicate whether it is vaccine-related polio versus wild-strain polio, do they?

A No.

Dr. Udom also tried to explain away a 1991 EMG report from the Medical College of Georgia, which diagnosed Ms. Thornton as suffering from acquired sensory motor polyneuropathy, not paralytic polio. Dr. Udom's response to her variance from this 1991 re-

port, and from the conclusions of other physicians, was that there was no way to reach a conclusion regarding the cause of the muscle wasting and the polyneuropathy, and that, therefore, the opinions of several treating physicians often will produce different diagnoses.

On March 28, 1995, the government presented live testimony from Dr. Cohen regarding his treatment of Ms. Thornton from February 5, 1980 to April 23, 1982, for what he confirmed upon examination as rheumatoid arthritis. Dr. Cohen testified that rheumatoid arthritis can cause muscle atrophy. Dr. Cohen stated that he never suspected that Ms. Thornton had polio, and that his consideration of the possibility of Guillian–Barre syndrome was based solely upon entries in Ms. Thornton's medical history. Dr. Cohen, however, admitted that he had minimal experience with treating and caring for adult patients with polio, maybe one or two patients in sixteen years.

The government also presented expert medical testimony from Dr. Parrott, a pediatrician with specialties in infectious diseases and virology. Dr. Parrott stated that he has seen many children, and a few adult patients with polio, has seen patients with Guillian–Barre syndrome, and has seen adults and children with rheumatoid arthritis. He testified that after reviewing all of the records, he believes, to a reasonable degree of medical certainty, that Ms. Thornton did not contract polio and did not suffer from Guillian–Barre syndrome, because, in his opinion, Ms. Thornton's clinical features are not compatible with either disease. He agreed with Dr. Cohen and Dr. Wolf that Ms. Thornton's symptoms are compatible with rheumatoid arthritis. Dr. Parrott based his diagnosis on several factors. First, the incubation period for polio without paralysis is three to six days, and then the paralysis occurs for seven to twenty-one days. Thus, Ms. Thornton's testimony that the paralysis ensued "almost immediately" is not consistent with paralytic polio. Even if Ms. Thornton's symptoms were latent for as long as a week, Dr. Parrott found that her description of her clinical symptoms were not consistent with the typical picture of paralytic polio. According to

Dr. Parrott, paralysis caused by polio is typically spotty and asymmetrical, not symmetrical, as described by Ms. Thornton. Moreover, he stated that the pain in the muscles, swelling of the ankles, the locking of the arms and the legs bending backward are not early signs of polio.

Dr. Parrott further found that the onset and symptoms described by Ms. Thornton likewise are inconsistent with Guillian–Barre syndrome. First, he testified that in order for Guillian–Barre syndrome to be a result of an enterovirus, there needs to be a latency period, but that Ms. Thornton's "features started very soon after the vaccine." Also, Guillian–Barre syndrome is an ascending paralysis, from the feet up, not as described by petitioner, from the neck down. Moreover, it is not at all typical in either polio or Guillian–Barre syndrome for paralysis to come and go, as described by petitioner. Dr. Parrott further explained that a high titer test taken in 1978 cannot be evidence of a polio infection occurring from a 1963 vaccine because the measurable antibody is short-lived and would not maintain at that level for fifteen years. Thus, Dr. Parrott surmised, it is more likely that a high titer test would be the result of exposure to a wild virus in the community. With regard to an EMG test, Dr. Parrott noted that it did not indicate damage to the anterior horn cells, which typically are damaged in poliomyelitis. As noted by the special master, Dr. Parrott agreed with Drs. Cohen and Wolf that Ms. Thornton suffers from rheumatoid arthritis.

On June 2, 1995, the special master issued an unpublished decision in favor of the respondent. The special master found that Ms. Thornton was not entitled to compensation. The special master noted that "the age of the case and the lack of medical records created difficult factual questions of what happened and when it did happen." The special master concluded:

Ultimately, resolution of this case centers on the convincing nature of, and therefore the credibility of, the experts who testified in this case. Given the court's findings of facts, petitioner must prove that the symptoms she suffered within 30 days following vaccination were symptoms of polio or that

the vaccination caused whatever problems were being suffered within that period. § 11(c)(1)(C).

\* \* \* \* \* \*

After considering the information contained in the medical records and after reviewing the transcript of factual testimony, the court finds that Ms. Thornton did receive a polio vaccine in 1963 and did exhibit some symptoms within 30 days following the vaccination. While there are obvious discrepancies and inexactitudes in Ms. Thornton's affidavits and testimony, the court believes that her basic message is consistent and accurate, *i.e.,* that she suffered some problems within 30 days after vaccination. This message is supported by the affidavits submitted by others on her behalf and by the early histories given to Dr. Cohen. However, while the court accepts these two facts, the receipt of the vaccine and the suffering of some problems within the 30 day period, the court does not accept as fact that Ms. Thornton became "paralyzed" within that timeframe or at any subsequent time. There is no evidence in this record to substantiate Ms. Thornton's claim that she became paralyzed. In fact, the testimony of her son is to the contrary.

\* \* \* \* \* \*

In analyzing the expert testimony in this case, the court notes that Dr. Parrot was far and away the most credible, based upon his extensive relevant background, his preparation for the case, and his cogent testimony. Dr. Cohen's testimony was also highly credible as a former treating doctor simply restating his past findings and treatment. Dr. Udom's testimony in contrast lacked preparation, knowledge, depth, clarity, and therefore was unconvincing.

Consequently, the special master held that the "[p]etitioner has not demonstrated by a preponderance of the evidence that the polio vaccination she had was either the presumptive cause or in fact the cause of her medical problems." The special master, therefore, determined that petitioner was not entitled to compensation under the Vaccine Compensation Program.

In accordance with the rules of this court, Ms. Thornton had thirty (30) days from June 2, 1995, when the special master's report was issued, to file a motion with this court to review the decision of the special master. *See* 42 U.S.C. § 300aa–12(e)(1) (Supp.1994); Rules of the United States Court of Federal Claims (RCFC), Appendix J (The Vaccine Rules), Rule 23. Following issuance of the special master's opinion, the next filing received from Ms. Thornton, now acting *pro se,* was a letter, dated July 1, 1995, requesting an extension of time to file an appeal with this court. Ms. Thornton's request was stamped received by the clerk's office on July 5, 1995. Upon receipt of Ms. Thornton's request at the court, the clerk's office sent the petitioner's request to this judge for action, noting several defects in the filing. Unfortunately, notwithstanding assignment to this judge for consideration of Ms. Thornton's request for an extension of time to file an appeal, on July 5, 1995, the clerk's office had entered a final judgment, in accordance with Vaccine Rule 11(a), and the special master's June 2, 1995 decision denying compensation.

In her request for an extension of time to seek review, petitioner stated that she was under the false impression that her counsel, Mr. Toliver, had filed an appeal. Upon learning in a letter she had received from her counsel on June 30, 1995 that no motion for review had been filed, and that none would be filed, petitioner submitted a hand-written request to the court seeking a thirty (30) day extension to find new counsel and to file an appeal. Attorney Toliver still appeared on the court records as attorney of record; no motion to relieve Mr. Toliver as counsel had been received by the court. According to petitioner's request:

> The reason for the request is that I was under the impression that my attorney had already filed the appeal. Today, June 30, 1995, upon receipt of a letter from my former attorney, Mr. Toliver, I was informed that nothing had been done to date and that he had no intention of doing anything further in this matter.

Subsequently, in the order issued by this court on August 7, 1995, the court acknowledged that the apparent untimeliness of the petitioner's filing was due to unique circumstances present in petitioner's case, including an intervening federal holiday. Moreover, the court concluded that upon being thrust into the position of acting as a *pro se* litigant one day before the filing deadline, Ms. Thornton, not an attorney, and now acting *pro se*, made reasonable efforts to act promptly and to conform to the court's timing requirements for filing an appeal. The court, therefore, vacated the judgment entered by the clerk of the court on July 5, 1995, and granted petitioner an opportunity to have the opinion issued by the special master reviewed by this court. Ms. Thornton was given until September 7, 1995, to file a complete memorandum of objections and motion for review in accordance with the rules of this court.

On August 31, 1995, Ms. Thornton submitted a request, dated August 8, 1995, for permission to proceed as a *pro se* litigant. The submission was defective in several respects and failed to comply with the Rules of the United States Court of Federal Claims (RCFC). Moreover, it was sent as correspondence to the Judge, rather than submitted as a formal filing to the court. On September 13, 1995, this court also received correspondence from Ms. Thornton's son, Joseph Thornton.

Despite the failure of petitioner to comply with the filing requirements of the court, on September 21, 1995, this court issued an order incorporating into the record Ms. Thornton's handwritten "Objection to Decision," which was accompanied by a statement, dated March 21, 1991, from Willie B. Hall; a copy of an undated affidavit from Rita Udom, M.D.; and the correspondence from Ms. Thornton's son. The court also granted Ms. Thornton permission to proceed in the case *pro se.* The filings, however, had not been properly served upon the government. The court, therefore, ordered that copies of all the documents be provided to the respondent, and ordered the government to respond on or before Monday, October 23, 1995. Ms. Thornton also was given the opportunity to file a reply to the government's filing.

The government submitted a memorandum in response on October 17, 1995, claiming that the special master's determination was proper and that his decision was based on factual findings that were neither arbitrary nor capricious. The government urged that the decision of the special master should be upheld.

On November 3, 1995, this court received a submission from Ms. Thornton titled "Objectives [sic] to Decisions," which was filed on November 8, 1995. This submission was again improperly sent to chambers, and was submitted to the clerk's office. Despite this defect, the court filed the submission by leave of the judge. This submission was in essence a typed revision of the submitted "Objection to Decision," filed earlier by petitioner on September 5, 1995.

## DISCUSSION

When deciding a motion to review a special master's decision, the judges of this court shall:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or,

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2).

As stated in the legislative history of the Vaccine Act:

The conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

H.F.Conf.Rep. No. 386, 101st Cong., 1st Sess. at 512–13, 517, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3115, 3120.

■ Although review by the judges of this court of decisions issued by the special master should be conducted within the bounds described above, 42 U.S.C. § 300aa–12(e)(2) dictates that the judges of this court should utilize differing and distinguishable standards of review, depending upon which aspect of the case is under scrutiny. As stated by the United States Court of Appeals for the Federal Circuit:

These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by us, as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard. The latter will rarely come into play except where the special master excludes evidence.

*Munn v. Sec'y DHHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992). Adopting these guidelines, the judge in *Cox v. Sec'y DHHS* likewise wrote:

Each standard articulated in 42 U.S.C. § 300aa–12(e)(2)(B) applies to a different aspect of the special master's decision. The court evaluates findings of fact under the 'arbitrary and capricious standard'; legal conclusions under the 'not in accordance with the law standard'; and discretionary rulings under the 'abuse of discretion standard.' *See Munn v. Sec'y DHHS*, 970 F.2d 863, 870 (Fed.Cir.1992).

*Cox v. Sec'y DHHS*, 30 Fed.Cl. 136, 142 (1993); *see also Perreira v. Sec'y DHHS*, 27 Fed.Cl. 29, 31 (1992), *aff'd*, 33 F.3d 1375 (Fed.Cir.1994).

■ The arbitrary and capricious standard of review is a narrow one. *Johnston v. Sec'y DHHS*, 22 Cl.Ct. 75, 76 (1990). *See Cucuras v. Sec'y DHHS*, 993 F.2d 1525, 1527 (Fed. Cir.1993); *Estate of Arrowood v. Sec'y DHHS*, 28 Fed.Cl. 453, 457 (1993); *Bradley v. Sec'y DHHS*, 991 F.2d 1570, 1574 (Fed. Cir.1993); *Perreira v. Sec'y DHHS*, 27 Fed. Cl. 29, 32 (1992), *aff'd*, 33 F.3d 1375 (Fed.Cir. 1994). When applying the arbitrary and capricious standard, a reviewing court is not empowered to substitute its own judgment for that of a previous trier of fact. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Instead, when determining whether a decision was arbitrary and capricious, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* Furthermore, "[i]f the special master has considered the relevant evidence in the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y DHHS*, 940 F.2d 1518, 1528 (Fed.Cir.1991); *see Lewis v. Sec'y DHHS*, 26 Cl.Ct. 233, 236 (1992); *Murphy v. Sec'y DHHS*, 23 Cl.Ct. 726, 729–30 (1991), *aff'd*, 968 F.2d 1226 (Fed.Cir.1992). Thus, the decision of a special master may be found to be arbitrary and capricious only if the special master:

relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hines v. Sec'y DHHS*, 940 F.2d at 1527 (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Moreover, according deference to the special master's decision requires that the reviewing court "may not substitute its own judgment for that of the special master if the special master has considered all relevant factors, and has made no clear error of judgment." *Lonergan v. Sec'y DHHS*, 27 Fed.Cl. 579, 579–80 (1993); *Perez v. Sec'y DHHS*, 27 Fed.Cl. 200, 201 (1992) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Hyundai Electronics Indus. Co. v. United States Int'l Trade Comm'n*, 899 F.2d 1204, 1209 (Fed.Cir.1990); *Gamalski v. Sec'y DHHS*, 21 Cl.Ct. 450, 451–52 (1990)).

Although the arbitrary and capricious standard is widely used, there is no uniform

definition of this standard. In *Hines v. Sec'y DHHS*, however, the court has accumulated, and offered as guidance, a wide variety of examples in which the arbitrary and capricious standard has been applied:

'an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (review of agency rule making); agency must articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,' *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (review of agency adjudication); 'proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations,' *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 913 (Fed.Cir.1988) (quoting *Keco Ind., Inc. v. United States*, 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974) (review of preaward bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found, no matter how substantial may be the support for those facts," *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1498 (D.C.Cir.1988) (review of agency adjudication); 'the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decision-making,' rather than its actual decision,' *United States v. Garner*, 767 F.2d 104, 116 (5th Cir.1985); 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions …,' *Mobil Oil Corp. v. Department of Energy*, 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.*, 531 F.2d 1071, 1076–77 (Temp.Emer.Ct.App.1976)).

*Hines v. Sec'y DHHS*, 940 F.2d at 1527–28.

Compensation under the Vaccine Act is determined pursuant to the statutory guidelines set forth in the Vaccine Act. According to the Act, a petitioner is entitled to compensation only if the petitioner can demonstrate entitlement, by a preponderance of the evidence, 42 U.S.C. §§ 300aa–13(a)(1)(A), and that the case under review meets the multiple criteria specified in the Vaccine Act. 42 U.S.C. § 300aa–11(c)(1). In the context of a Vaccine Act case, the preponderance of the evidence standard has been explained as more than a probability. The special master must "believe that the existence of a fact is more probable than its nonexistence, before the [special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *Ciotoli v. Sec'y DHHS*, 18 Cl.Ct. 576, 588 (1989) (quoting *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J. concurring) (quoting F. James Civil Procedure 250–1 (1965)); *see also Hines v. Sec'y DHHS*, 940 F.2d 1518, 1525 (Fed.Cir. 1991). Otherwise stated, the preponderance of the evidence standard requires the petitioner to "adduce evidence that makes the existence of a contested fact more likely than not." *Arrowood v. Sec'y DHHS*, 28 Fed.Cl. 453, 458 (1993) (quoting *McClendon v. Sec'y DHHS*, 23 Cl.Ct. 191, 195 (1991) (citing Black's Law Dictionary 1064 (5th ed. 1979))).

The matters to be considered by the special master when determining whether to award compensation are detailed in 42 U.S.C. § 300aa–13(b)(1). The special master is directed to consider relevant medical and scientific evidence contained in the record, as well as:

(A) any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition or death, and

(B) the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions.

42 U.S.C. § 300aa–13(b)(1)(A) & (B).

In the instant case, the first of the relevant statutory requirements listed in 42 U.S.C. § 300aa–11(c)(1) is that the individual suffering from the injury must have received one of the vaccines listed in the Vaccine Injury Table, which appears at 42 U.S.C. § 300aa–14. Petitioner in the instant case alleges that she received a polio vaccine, Monovalent Sabin # 1, on May 19, 1963, which is a vaccine recognized as compensable by the Vaccine Injury Table. Despite the inconsistencies between Ms. Thornton's affidavits and testimony, the special master found that Ms. Thornton did in fact receive a polio vaccination in 1963, and did exhibit some symptoms within 30 days following the vaccination.

■ According to the special master, fundamental to his decision not to award benefits to petitioner was Ms. Thornton's failure to establish, by a preponderance of the evidence, that she had become paralyzed within the requisite time frame [30 days] following administration of the vaccination, or at any subsequent time. *See* 42 U.S.C. §§ 300aa–11(c)(1) and 300aa–14. Although Ms. Thornton testified regarding her alleged paralysis, her testimony is unsubstantiated by other testimony or by the medical records.[3] Moreover, the Vaccine Act expressly prohibits a special master from finding a table injury "based on the claims of the petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa–13(a)(1). Consequently, the special master correctly found that the record does not establish Ms. Thornton's claim of paralysis.

Even a generous interpretation of petitioner's objections to the special master's decision fails to bring the factual findings of the special master into question. After a review of the record, and as discussed above, this court finds that Ms. Thornton's first objection regarding the "questionable time and documentation of paralysis" asserts no basis for reconsideration. Similarly, Ms. Thorn-

ton's objection to the assertion in the special master's decision that "Dr. Udom submitted two statements," also provides no basis for relief. She alleges that a third letter was sent by Dr. Udom to her attorney, who subsequently failed to submit it to the special master. This third letter was attached to petitioner's "Objection to Decision," which was submitted to this court on September 5, 1995. After reviewing the third letter, however, it is clear that it is virtually identical to the second affidavit submitted by Dr. Udom, which was submitted to the special master on June 22, 1993, prior to issuance of his decision.

■ Finally, responding to the statement in the special master's decision that "Dr. Udom was not properly prepared," she asserts that Dr. Udom was not given ample time, was interrupted mid-sentence, and was not as audible as the other witnesses who testified by telephone. The transcript is clear, however, that during Dr. Udom's July 21, 1993 testimony, the special master offered Ms. Thornton numerous opportunities to inquire further of Dr. Udom while sworn in as a witness at the July 21, 1993 hearing. At some points, petitioner declined, at others, Ms. Thornton posed additional questions and on still other occasions petitioner made lengthy statements for the record. At no point did Ms. Thornton remark that she could not hear or that she felt Dr. Udom was not being extended the opportunity to complete her testimony. Moreover, on March 28, 1995, during the testimony of Dr. Parrott, the government's expert witness, Dr. Udom listened to Dr. Parrott's testimony by telephone in order to make appropriate responses. Dr. Udom remained silent throughout the testimony. Although Dr. Udom's responses were often confused and unsubstantiated, she was afforded more than adequate opportunities to offer her opinion.

This court also supports the special master's greater reliance on the other medical experts who testified in the case. Dr. Parrott, the expert offered by the government, specialized in infectious diseases and had experience treating patients with both polio and

---

3. During his testimony, Ms. Thornton's son, Joseph, failed to offer support for the contention

that Ms. Thornton was "paralyzed" at any point subsequent to the May 19, 1963 vaccination.

rheumatoid arthritis. He testified that he believed Ms. Thornton suffered from arthritis, not polio. Moreover, the record reveals that Dr. Parrott was clear and articulate in his enumeration of the various factors which led him to conclude that Ms. Thornton suffered from rheumatoid arthritis, rather than polio or Guillian–Barre syndrome. Dr. Parrott's testimony was substantiated by established medical text and accompanied with descriptions of why Ms. Thornton's clinical symptoms and medical history do not correlate with the contention that Ms. Thornton contracted polio or Guillian–Barre from the administration of the polio vaccination in 1963. Furthermore, Dr. Parrott's diagnosis was corroborated by the testimony and medical records submitted by Dr. Cohen, who had treated Ms. Thornton for rheumatoid arthritis in the early 1980's.

 It is well established in the law that witness credibility is primarily within the purview of the special master as the trier of fact, and that the special master's determinations of credibility should be given appropriate deference, since he had the opportunity to listen to the testimony, to ask questions of the witnesses, and to observe their demeanor. *Richardson v. Sec'y DHHS*, 23 Cl.Ct. 674, 678 (1991); *see also Burns v. Sec'y DHHS*, 3 F.3d 415, 417 (Fed.Cir.1993); *Walker v. DHHS*, 33 Fed.Cl. 97, 100 (1995). In this case, the special master also personally questioned the medical experts, even after the direct and cross-examination, in an effort to further evaluate the basis of their opinions and to assess their credibility. A special master's determinations regarding credibility are "virtually unreviewable." *Id.* (citing to *Hambsch v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986); *Griessenauer v. Dep't of Energy*, 754 F.2d 361, 364 (Fed. Cir.1985)). This court has found the special master's credibility determinations to be sound, and, therefore, will defer to those judgments.

## CONCLUSION

After careful review of the entire record in this·case, this court finds that the decision of the special master to deny compensation to the petitioner was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The petitioner failed to prove, by a preponderance of the evidence, that the symptoms suffered by the petitioner were a result of the 1963 polio vaccination. Although the circumstances surrounding Ms. Thornton's medical difficulties are unfortunate, the statutory provisions of the Vaccine Act do not permit compensation to a petitioner such as Ms. Thornton presenting the facts of the case currently before the court. Therefore, the petitioner's motion for review is, hereby, **DENIED.** The court, hereby, **AFFIRMS** the special master's June 2, 1995 decision denying compensation.

**IT IS SO ORDERED.**