**Debra and Barry EPSTEIN, as Parents and Natural Guardians of Andrew V. Epstein, Petitioners,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–3242–V.

United States Court of Federal Claims.

April 26, 1996.

the court any "claim or defense" having "a question of law or fact in common" with the main action.

Marilyn Rigmaiden, Philadelphia, Pennsylvania, for petitioners.

Aristia Karas, United States Department of Justice, Washington, D.C., for respondent, with whom was Gerald W. Fisher, Assistant Director, Torts Branch, Civil Division.

## OPINION

HORN, Judge.

The above-captioned case was initially assigned to this judge on November 30, 1995, for the purpose of conducting a review of the special master's decision, issued October 31, 1995. *Epstein v. Sec'y DHHS,* Case No. 90–3242V, Office of Spec.Mstr., October 31, 1995. In her decision, the special master denied compensation to the petitioners under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1 through 34 (1991) (hereinafter "Vaccine Act").[1] Following issuance of the decision, on November 30, 1995, the petitioners filed a Motion for Review, alleging that the special master had committed several errors in reaching her decision. The respondents filed a Memorandum in Response to Petitioners' Motion for Review on December 29, 1995, asking this court to uphold the special master's decision.

Initially, the petitioners' claim for compensation pursuant to the Vaccine Act on behalf of their son, Andrew V. Epstein, was filed before the Office of the Special Masters in the United States Claims Court[2] on October 1, 1990. Petitioners brought their claim before the special master alleging that their son, Andrew, had suffered a vaccine-related injury within 72 hours after receiving his fourth Diphtheria–Pertussis–Tetanus (hereinafter "DPT") vaccination on August 29, 1988. Petitioners alleged that the claimed injury was manifested by neurological injuries, including encephalopathy, screaming, and crying.[3] Petitioners also allege that Andrew suffered residual effects from the vaccination, including developmental delays and communication disorders for more than six (6) months after the vaccination, that he continues to suffer such residual effects at the present time, and that such effects are permanent in nature.

The special master held evidentiary hearings on June 29, 1994 and April 11, 1995. Following a review of the testimony and the documents included in the record, the special master issued a written decision, which found that the petitioners were not entitled to compensation. The special master concluded that "[t]here is not a preponderance of the evidence that Andrew suffered a shock-col-

---

1. Tit. XXI, § 2112, as added Nov. 14, 1986, Pub.L. No. 99–660, tit. III, § 311(a), 100 stat. 3761; Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224 and amended Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224, Pub.L. No. 100–203, tit. IV, §§ 4307(3)(c), 4308, as amended and added July 1, 1988, Pub.L. No. 100–360, tit. IV, § 411(*o*)(2), (3)(A), 102 Stat. 808; Dec. 19, 1989, Pub.L. No. 101–239, tit. IV, § 6601(d)–(i), 103 Stat. 2286–2290; Nov. 3, 1990, Pub.L. No. 101–502, § 5(b), 104 Stat. 1286; Nov. 26, 1991, Pub.L. 102–168, tit. II, § 201, 105 Stat. 1102; Oct. 27, 1992, Pub.L. 102–531, tit. III, § 314, 106 Stat. 3508; June 10, 1993, Pub.L. 103–43, tit. XX, § 2012, 107 Stat. 312; Aug. 10, 1993, Pub.L. 103–66, tit. IV, § 13632, 107 Stat. 312; Dec. 14, 1993, Pub.L. 103–183, tit. VII, § 708.

2. Following enactment of the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, the United States Claims Court was renamed the United States Court of Federal Claims. In accordance with General Order 33 issued by the United States Court of Federal Claims, the court adopted the rules of the United States Claims Court. The substance of the rules of the court is unaffected by the legislation, other than with respect to the name change of the court and, therefore, the name change of the rules.

3. During this case, petitioners have used a number of clinical terms rather loosely. In their original petition, the Epsteins described Andrew as suffering an encephalopathy following administration of the vaccine. In an affidavit signed by petitioner Debra Epstein on September 9, 1993, she stated that the term encephalopathy was placed in the petition by Susan Phillips, a secretary at the law firm of Francis Ferrara when the original petition in the case was filed. In the petitioners' witness list, however, Dr. Mark Geier, petitioners' expert, was offered to testify that Andrew suffered shock-collapse or hypotonic-hyporesponsive collapse. Similarly, in petitioners' prehearing memorandum, they alleged that Andrew suffered a shock-collapse or hypotonic hyporesponsive collapse. At the evidentiary hearing, Dr. Geier based his opinion on a theory of shock-collapse, although he also testified to an overlap between shock-collapse and encephalopathy.

Furthermore, although in their original complaint, the Epsteins refer to the vaccine as "DTP/Polio vaccine," the Vaccine Act uses the term "DPT," which is how the court will refer to the vaccine at issue. Moreover, although included in the original petition as "DTP/Polio," there is no further discussion of polio in the testimony, the filings, or in the decision of the special master.

lapse as defined by the Vaccine Injury Table, with onset within 72 hours of the administration of the DPT vaccination on August 29, 1988." [4] The special master also ruled that "[t]here is not a preponderance of the evidence that petitioners expended in excess of $1000 in unreimbursed medical expenses as a result of a vaccine-related injury."

## FACTS [5]

Andrew was born on February 25, 1987. There were no complications at the time of his birth. Initially, he seems to have achieved normal developmental milestones. On July 18, 1988, Andrew's pediatrician examined him, and noted "seems fine." According to his pediatrician, at 12–months of age, he was healthy and able to say five words. During his 18–month examination on August 29, 1998, the family pediatrician, Dr. Deborah White, noted in Andrew's medical record: "few words 'O' phrases." At the hearing, Dr. White also testified that Andrew "did not use any phrases and he spoke, [sic] he only communicated with a few words." She also stated: "He wasn't communicating. He showed some subtle signs at that visit that raised my concern that he was not performing at the usual milestones for an 18–month–old child." In an affidavit, dated March 4, 1994, Dr. White also noted that at his one-year checkup, Andrew was "speaking five words," at his 15–month checkup, he was "increasing articulation," but at his 18–month

checkup, "Andrew spoke few words and no phrases," and that she "became concerned that he was falling off developmentally." Subsequently, when Andrew was in her office for his two-year checkup, Dr. White noted that he spoke no words at all and did not follow commands. Also, according to Dr. White's affidavit, it was during the two-year checkup that she determined Andrew had a speech delay, and she referred him for speech evaluation.

There is no dispute between the parties that on Monday, August 29, 1988, at Andrew's 18–month checkup, he received his fourth DPT vaccine. Debra Epstein, Andrew's mother, testified that after leaving the doctor's office following his fourth DPT vaccination, Andrew became very tired, did not drink, eat, or hold himself up, and slept for the rest of the day. Mrs. Epstein also stated that Andrew felt hot to the touch and evidenced a fever of 103° to 104°. She testified that she gave Andrew Tylenol and put him to bed. Apparently, however, she did not contact the doctors, although Andrew's symptoms allegedly lasted for the next several days.[6] Mrs. Epstein also testified that the night Andrew received his fourth DPT vaccine, he began to suffer what was later diagnosed as "night terrors," screaming and crying for extended periods of time each night, and that this behavior continued for over a year.[7]

4. Section 300aa–14(a)(1), the Vaccine Injury Table, lists the types of injuries and the time periods in which the first symptom or manifestation of onset must occur in order to be eligible for compensation pursuant to the Vaccine Act. Both encephalopathy and shock-collapse are identified on the table as cognizable injuries, and the time period is listed as within three days for both.

5. The court notes that the petitioners' exhibits appear to have been submitted without a table of contents, index, or any cognizable organization. Moreover, some exhibits lack page numbers or any organized numbering system.

6. The decision by the parents not to take Andrew to a doctor after he allegedly became symptomatic following his fourth DPT vaccination is all the more remarkable given testimony in the record that Andrew had a fever for a day or two and soreness at the injection site after his third DPT vaccination. Moreover, according to the record, when Andrew's brother Adam experienced a negative reaction to a DPT vaccination, the parents apparently called the pediatric office and Adam

was seen by the doctors the next day. At the hearing, Mrs. Epstein testified both that she could not recall and that she had not taken Adam to the doctor's office the next day. Adam's visit, and the phone call from Mrs. Epstein about Adam's post-vaccination symptoms the day before, however, are both noted in the medical records maintained by the doctor's office.

7. This court agrees with the special master that the testimony of Mrs. Mary C. Valenti, Mrs. Epstein's mother and Andrew's grandmother, which generally corroborated the testimony of Mr. and Mrs. Epstein, was marred by frequent memory lapses and inconsistencies. After reviewing Mrs. Valenti's testimony, this court likewise has determined that her testimony should be considered unreliable. Moreover, although Barry Epstein, Andrew's father, also testified, his testimony was duplicative of and less complete than the testimony offered by his wife. Moreover, as is discussed below, his testimony is subject to the same statutory and credibility deficiencies as the testimony offered by Mrs. Epstein.

Despite the alleged seriousness of Andrew's symptoms after his fourth DPT vaccination, however, Mr. and Mrs. Epstein continued their normal routines following the alleged onset of those post-vaccination symptoms. Mrs. Epstein worked, attended night law school classes, and had her mother babysit Andrew, even on the night he was vaccinated. On the Saturday[8] evening after Andrew received his fourth DPT vaccination, the Epsteins went out to dinner to celebrate their anniversary.

During the time the Epstein children were patients at the Chestnut Hill Pediatric Group, the Pediatric Group apparently kept a routine summary of each phone call received. At the hearing, Mrs. Epstein testified that on August 30, 1988, the day after Andrew received his fourth DPT inoculation, she telephoned the Chestnut Hill Pediatric Group, in which Dr. White practiced. According to Mrs. Epstein, when she learned that Dr. White was not in the office, she allegedly spoke to one of the nurses. Although there is no record of any such contacts in the regularly kept logs of the Chestnut Hill Pediatric Group, Mrs. Epstein testified that she called the doctor's office several times, each time speaking to a nurse, not to a doctor.

The evidence demonstrates, however, that during the two weeks after Andrew received his fourth DPT vaccination, Mrs. Epstein did not call or bring Andrew into the doctor's office or take him to a hospital, testifying that the nurses at the Chestnut Hill Pediatric Group had told her to come in only if Andrew had a seizure. The first recorded contact from Mrs. Epstein to the Pediatric Group following Andrew's August 29, 1988 DPT shot, was a phone call placed on Thursday, September 15, 1988. This call, however, appears to have been unrelated to Andrew's fourth DPT vaccination, 17 days earlier, because the notes in the doctor's file state: "Fever since Friday [September 9, 1988] 99°–101°. Ended Monday, Rash started Monday getting worse. Child very cranky."

When Andrew was seen following the September 15, 1988 phone call, Andrew was not

seen by Dr. White. Instead, he was examined by Dr. Harry Butson, another doctor associated with the Chestnut Hill Pediatric Group. Dr. Butson diagnosed Andrew's condition as roseola, after noting Andrew's fever, irritability, and the rash on his face and body. Dr. Butson's notes, however, do not reflect any of the other symptoms that Mrs. Epstein claims Andrew suffered following his fourth DPT vaccination, with the exception of a fever, which could also be explained by the roseola. Dr. Butson did note "no more pertussis" on Andrew's record, but he testified that he based this notation on information he was provided by Mrs. Epstein regarding Andrew's alleged symptoms following the DPT vaccination, not on personal observation.

Andrew was next examined at his two-year checkup on February 27, 1989. Prior to this examination, Mrs. Epstein had not communicated with Dr. White for six months. At the two-year examination, Dr. White noted in her records that Andrew had "*no words* at all, does not follow commands." Other than his lack of language skills, Dr. White wrote that Andrew was an otherwise "well child." Dr. White did not recall, and did not have any notes in her record of Andrew's two-year examination, that Mrs. Epstein had mentioned any adverse reactions on Andrew's part to his fourth DPT vaccination.

According to Andrew's mother, after the initial fever and injection site symptoms subsided following Andrew's fourth DPT vaccination, Andrew regressed linguistically and was unable to continue learning new words. According to his mother, Andrew lost the ability to say the phrases and words he knew prior to his 18–month checkup, and only repeated such phrases and words if prodded by his parents. His behavior toward his family changed and he became a different child, ceasing to communicate with other family members. Mrs. Epstein also testified that Andrew lost interest in his surroundings and his toys, and that he lost his ability to grip objects. Moreover, according to the mother, he did not interact well with others, and developed screaming and crying tantrums,

---

**8.** August 29, 1988, the date on which Andrew received his fourth DPT vaccination, was a Monday.

which he allegedly had not exhibited prior to August 29, 1988.

In order to record Andrew's childhood milestones, Mrs. Epstein kept a baby book and corresponding calendar. In these documents, the mother made entries regarding Andrew's development, such as when Andrew spoke, walked, and achieved other milestones. The record in this case reveals, however, that the notations were not always precise. Mrs. Epstein testified that the date the recordings were entered were not necessarily the date on which the events actually had occurred. Although some entries were dated, she testified that she would carry dates forward. Furthermore, she indicated that sometimes she would combine more than one month on one page of the calendar. She said she would record the events on or around the time she believed the milestones had occurred.

The petitioners also offered Dr. Joyce Mauk, a doctor on the staff of Children's Hospital of Philadelphia and Children's Seashore House, as a witness. Dr. Mauk did not appear to have independent factual knowledge of Andrew's development and had relied on Andrew's medical records and the baby book and calendar prepared by Mrs. Epstein to obtain the factual information on which she based her medical conclusions. Dr. Mauk testified that there was not enough evidence to conclude that Andrew had evidenced a developmental delay or language disorder before his 18–month checkup and fourth DPT vaccination. She stated: "It is my opinion that there is not solid concurrent, definitive documentation of any developmental delays in Andrew Epstein before 18 months of age in any of the documents reviewed." Dr. Mauk noted, however, that no formal developmental testing of Andrew appears to have been done prior to his 18–month visit to the doctor, and, therefore, Dr. Mauk also could not positively testify to the absence of a developmental delay before the fourth DPT vaccination.

On April 13, 1989, when Andrew was approximately two-years and two-months old,

he was evaluated by Dr. Mark Batshaw, a developmental pediatrician at Children's Hospital of Philadelphia, who testified on behalf of the respondents and also submitted an affidavit in the case. Dr. Batshaw testified that he obtained the historical information about Andrew's development from the medical records and from Andrew's parents.

Dr. Batshaw conducted his evaluation of Andrew on April 13, 1989. He diagnosed Andrew as having a communications disorder.[9] His initial report stated that:

He [Andrew] had a single word at 12 months, and began some immature jargon. At 15 months, parents became concerned because there was no further progression of abilities. He would imitate a number of words and gestures. Between 15–18 months, there was actually a dropping off of these skills, and at present, the parents note that he doesn't have any consistent words or gestures.

He did not identify any connection between Andrew's developmental delay and his fourth DPT shot in his report, and does not recall having discussed a connection with Mrs. Epstein when he first examined Andrew in 1989.

Several years later, pursuant to a written request from Andrew's mother, dated June 19, 1992, Dr. Batshaw amended his initial report significantly, to change the sentences which described the parents' concern about the lack of progression of abilities at 15–months and the dropping off of skills from 15–18 months. Dr. Batshaw testified that he first became aware of a link between Andrew's developmental delay and his DPT vaccination from Mrs. Epstein's June 19, 1992 letter, which requested the amendment. The revised report, dated July 1, 1992, reads as follows:

At around 18 months, parents became concerned because there was no further progression of abilities. He would imitate a number of words and gestures. Between 21–24 months, there was actually a dropping off of these skills, and at present, the

9. The record suggests that Dr. Batshaw was not the first doctor to diagnose Andrew's developmental delays. He had already been seen by Dr.

Gail Sacks, who did not testify, but whose report, dated March 30, 1989, is in the record.

parents note that he doesn't have any consistent words or gestures.

Dr. Batshaw's amended report, therefore, removed the information about parental concerns that Andrew was exhibiting developmental delays prior to administration of Andrew's fourth DPT shot at 18–months.

As is discussed more fully below, the respondent also offered the testimony of Dr. Arnold Gale. After carefully evaluating the available information, Dr. Gale disagreed with petitioner's experts and concluded that Andrew most likely had a febrile reaction to the vaccination. Dr. Gale's testimony did not support petitioner's claims that Andrew suffered an on-table injury within three days following the DPT vaccination, as required in the Vaccine Table, in order to be eligible to receive compensation for a vaccine-related injury under the Vaccine Compensation Program.

## DISCUSSION

When deciding a motion to review a special master's decision, the judges of this court shall:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or,

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2).

As stated in the legislative history of the Vaccine Act:

The conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

H.R.Conf.Rep. No. 386, 101st Cong., 1st Sess. 512–13, 517, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3115, 3120.

Although review by the judges of this court of decisions issued by the special master should be conducted within the bounds described above, 42 U.S.C. § 300aa–12(e)(2) dictates that the judges of this court should utilize differing and distinguishable standards of review, depending upon which aspect of the case is under scrutiny. As stated by the United States Court of Appeals for the Federal Circuit:

These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by us, as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard. The latter will rarely come into play except where the special master excludes evidence.

*Munn v. Sec'y DHHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992). Adopting these guidelines, the judge in *Cox v. Sec'y DHHS* likewise wrote:

Each standard articulated in 42 U.S.C. § 300aa–12(e)(2)(B) applies to a different aspect of the special master's decision. The court evaluates findings of fact under the 'arbitrary and capricious standard'; legal conclusions under the 'not in accordance with the law standard'; and discretionary rulings under the 'abuse of discretion standard.' *See Munn v. Sec'y DHHS*, 970 F.2d 863, 870 (Fed.Cir.1992).

*Cox v. Sec'y DHHS*, 30 Fed.Cl. 136, 142 (1993); *see also Perreira v. Sec'y DHHS*, 27 Fed.Cl. 29, 31 (1992), *aff'd*, 33 F.3d 1375 (Fed.Cir.1994).

The arbitrary and capricious standard of review is a narrow one. *Johnston v. Sec'y DHHS*, 22 Cl.Ct. 75, 76 (1990). *See Cucuras v. Sec'y DHHS*, 993 F.2d 1525, 1527 (Fed.Cir.1993); *Estate of Arrowood v. Sec'y DHHS*, 28 Fed.Cl. 453, 457 (1993); *Bradley v. Sec'y DHHS*, 991 F.2d 1570, 1574 (Fed.Cir.1993); *Perreira v. Sec'y DHHS*, 27 Fed.Cl. 29, 32 (1992), *aff'd*, 33 F.3d 1375 (Fed.Cir.1994). When applying the arbitrary and capricious standard, a reviewing court is not

empowered to substitute its own judgment for that of a previous trier of fact. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Instead, when determining whether a decision was arbitrary and capricious, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* Furthermore, "[i]f the special master has considered the relevant evidence in the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y DHHS,* 940 F.2d 1518, 1528 (Fed.Cir.1991); *see Lewis v. Sec'y DHHS,* 26 Cl.Ct. 233, 236 (1992); *Murphy v. Sec'y DHHS,* 23 Cl.Ct. 726, 729–30 (1991), *aff'd,* 968 F.2d 1226 (Fed.Cir.1992). Thus, the decision of a special master may be found to be arbitrary and capricious only if the special master:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hines v. Sec'y DHHS,* 940 F.2d at 1527 (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

▮ Moreover, according deference to the special master's decision requires that the reviewing court "may not substitute its own judgment for that of the special master if the special master has considered all relevant factors, and has made no clear error of judgment." *Lonergan v. Sec'y DHHS,* 27 Fed.Cl. 579, 579–80 (1993); *Perez v. Sec'y DHHS,* 27 Fed.Cl. 200, 201 (1992) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Hyundai Elecs. Indus. Co. v. United States Int'l Trade Comm'n,* 899 F.2d 1204, 1209 (Fed.Cir.1990); *Gamalski v. Sec'y DHHS,* 21 Cl.Ct. 450, 451–52 (1990)).

Although the arbitrary and capricious standard is widely used, there is no uniform definition of this standard. In *Hines v. Sec'y DHHS,* however, the United States Court of Appeals for the Federal Circuit has accumulated, and offered as guidance, a wide variety of examples in which the arbitrary and capricious standard has been applied:

> 'an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (review of agency rule making); agency must articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,' *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (review of agency adjudication); 'proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations,' *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 913 (Fed.Cir.1988) (quoting *Keco Ind., Inc. v. United States,* 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974)) (review of preaward bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found, no matter how substantial may be the support for those facts," *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C.Cir.1988) (review of agency adjudication); 'the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decision-making,' rather than its actual decision,' *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985); 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions ...,' *Mobil Oil Corp. v.*

*Department of Energy,* 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.,* 531 F.2d 1071, 1076–77 (Temp. Emer.Ct.App.1976)).

*Hines v. Sec'y DHHS,* 940 F.2d at 1527–28.

█ Eligibility for compensation under the Vaccine Program is determined pursuant to the statutory guidelines set out in the Vaccine Act. According to the Act, the petitioners, in this case the parents as legal representatives of the child, are entitled to compensation only if they can show, by a preponderance of the evidence, that the facts presented meet the multiple criteria specified in the Vaccine Act. 42 U.S.C. § 300aa–13(a)(1)(A). In the context of a Vaccine Act case, the preponderance of the evidence standard has been explained as requiring more than a probability. The special master must "believe that the existence of a fact is more probable than its nonexistence before [the special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *Ciotoli v. Sec'y DHHS,* 18 Cl. Ct. 576, 588 (1989) (quoting *In re Winship,* 397 U.S. 358, 371–72, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J. concurring) (quoting F. James, Civil Procedure 250–1 (1965))). The *Ciotoli* court also states that "[m]ere conjecture or speculation will not establish a probability." *Id.* (citing *Snowbank Enter. v. United States,* 6 Cl.Ct. 476, 486 (1984)).

In their motion for review, the petitioners claim that when rendering factual findings, the special master failed to utilize the "preponderance of the evidence" standard as required by the Vaccine Act, but, instead, required proof that rose to a level of "scientific certainty." In her opinion, however, the special master explicitly stated:

> In every case, it is the petitioner's burden to show, by a *preponderance of the evidence,* the facts necessary to support entitlement to an award. Given the array of conflicting evidence, and after carefully considering the testimony and demeanor of the fact witnesses, I simply cannot con-clude that it is more probable than not that the onset of Andrew's injury began within three days of his August 29, 1980 DPT vaccination.

(Emphasis added.)

The special master heard testimony presented by both parties, as well as reviewed the documentary evidence included in the record. The special master's thorough review of the evidence, both documentary and testamentary, is evident in the lengthy analysis of the evidence included in the special master's final decision. Despite petitioners' contention, there is nothing in the decision issued by the special master which indicates that petitioners were held to any standard other than the preponderance of the evidence standard. To the contrary, the record and decision in this case, as is discussed more fully below, clearly demonstrate that the special master reached a proper conclusion, based upon the preponderance of the evidence standard.

Petitioners specifically contend that the special master failed to give the appropriate weight and credence to the testimony of petitioners' medical experts, which consisted of the oral testimony of Dr. Mark R. Geier and Dr. Joyce Mauk, and additional medical affidavits and reports. The petitioners relied heavily on Dr. Geier, who testified that after Andrew received his fourth DPT vaccination, he suffered shock-collapse syndrome. He stated that Andrew exhibited the classic symptoms of shock-collapse, as follows: "screaming," "not reacting to the environment," and "no longer react [sic] to people." Moreover, Dr. Geier testified that Andrew suffered "some overlap" in symptoms, exhibiting symptoms identified as encephalopathy at the same time as those which would identify shock-collapse. According to Dr. Geier, "there's an obvious overlap between shock-collapse and encephalopathy. And even between encephalopathy and residual seizure disorder, so that there's quite an overlap."

Dr. Geier further testified that he believes that the lot of DPT vaccinations from which Andrew's vaccine was derived was a "hot" lot. According to Dr. Geier, he knew of several other adverse reactions to the same lot number. Dr. Geier, however, was unable

to verify whether the lot from which Andrew received his vaccination was indeed a lot defined as "hot" by the Center for Disease Control and Prevention. Dr. Geier also was unable to assure the special master that Andrew, indeed, had received a vaccination from a "hot" lot, or that the vaccine Andrew received on August 29, 1988 had caused a negative reaction. Dr. Geier stated:

And so, just common sense tells you that if you—if you have a child who received a lot from which there are other—more than the expected number of adverse reactions, and the child has an adverse reaction, you have more suspicion that it was caused by that lot, than if it was a lot that had been perfectly clean and nobody had ever seen a reaction to that.

It also is important to note that the testimony of petitioners' experts, Drs. Geier and Mauk, was based solely upon Andrew's medical records and on information provided to them by the petitioners. Neither of these physicians could offer contemporaneous, first-hand knowledge, based on personal observation, about the period of time following Andrew's fourth DPT vaccination, when Andrew's symptoms allegedly began. Nor is there any contemporaneous medical documentation in the record, since Mrs. Epstein did not take Andrew to see any medical personnel within three days following Andrew's fourth DPT vaccination.

Dr. Geier even stated: "That is, assuming that the—Mrs. Epstein's testimony is correct and her description is the way it happened, that's classical for shock-collapse syndrome." Because the events described by Mrs. Epstein are not corroborated by medical records, the testimony of both Dr. Geier and Dr. Mauk is subject to the same credibility limitations as found in Mrs. Epstein's testimony. Therefore, to the extent that Mrs. Epstein's testimony is unsupported, so, too, is the testimony of Dr. Geier and Dr. Mauk. In Dr. Geier's own words: "And I think that from my reading of the table and the Aids to Interpretation, assuming that the mother's story is correct, it's a rather good fit [shock-collapse]. As I said, if you don't assume that, then you don't have any case at all."

Furthermore, Dr. Geier's findings were effectively rebutted by the testimony of Dr. Arnold Gale, a pediatric neurologist, who appeared on behalf of the respondents. Dr. Gale testified that, based on his review, within a reasonable degree of medical certainty, Andrew did not suffer from shock-collapse within three days after his fourth DPT vaccination. Dr. Gale stated that Andrew's symptoms and behavior after receiving the vaccine, even as described by the parents, were incompatible with having suffered shock-collapse. Specifically, Dr. Gale stated that a child suffering from shock-collapse usually does not have a high fever, although a fever is often present; does not cry, but instead is silent; generally is not irritable; is unable to take in fluids; and is not flushed. Additionally, Dr. Gale testified that "there's no such thing as alternating encephalopathy/shock-collapse." Dr. Gale testified that because a child undergoing shock-collapse presents such a dramatic event, it would be difficult for the parents of a child suffering from shock-collapse to continue their normal daily routines, as did the Epsteins after Andrew's fourth DPT. Dr. Gale also testified that the symptoms of shock-collapse generally subside. At the hearing, government counsel asked Dr. Gale: "By the day after his vaccination, even if Andrew had been experiencing a shock collapse, those dramatic symptoms should have been over after 12 hours, at the most, is that correct?" In response, Dr. Gale stated: "Yes. In my experience, more than 90 percent of the children who experience shock-collapse as a direct result of the DPT immunization, within eight to 12 hours, have resolutions—spontaneous resolution of their symptoms."

In Dr. Gale's opinion, since Andrew apparently continued to experience fever symptoms for several days, he most likely had a febrile reaction to the vaccination. Furthermore, Dr. Gale testified that it was impossible to make a determination as to whether or not an individual had suffered a vaccine-related injury based solely on information regarding the lot from which the vaccine was drawn. Dr. Gale concluded: "Andrew's record, to me, is entirely consistent with someone who has a pervasive communications disorder. And a communications disor-

der typically is congenital. In the absence of classic manifestations of stroke or encephalitis, it has a longstanding history, which usually begins well before 18 months."

This court should not second-guess the well-formed credibility determinations of the special master unless they are proven to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. In *Burns, by Burns v. Sec'y of DHHS,* 3 F.3d 415, 417 (Fed.Cir.1993), the court held that a determination of credibility is uniquely within the discretion of the special master. Moreover, "[t]he fact-finder has broad discretion in determining credibility because he saw the witnesses and heard the testimony." *Bradley v. Sec'y DHHS,* 991 F.2d 1570, 1575 (Fed.Cir.1993) (citing *Griessenauer v. Dept. of Energy,* 754 F.2d 361, 364 (Fed.Cir.1985)).

The special master in the case at bar had the opportunity to observe all of the expert witnesses first-hand while they testified, and to ask questions in order to determine their credibility. It was well within the discretion of the special master to determine that Dr. Gale's testimony was more credible than the testimony of Dr. Geier, and that the expert opinion offered by Dr. Geier was not credible. Moreover, there is nothing in the record which indicates that the special master's credibility determinations regarding any of the expert medical witnesses were arbitrary, capricious, an abuse of discretion, or not in accordance with the law.

The petitioners further allege that the special master failed to consider all the relevant medical and scientific evidence in the record, failed to weigh that evidence properly, in violation of 42 U.S.C. § 300aa–13(b)(1), and failed to give appropriate credence to the evidence that Andrew did not have any symptoms of a communications disorder prior to his DPT vaccination when he was 18–months old. The United States Court of Appeals for the Federal Circuit has held that reliance on medical records by the trier of fact is appropriate. The court stated: "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras v. Sec'y DHHS,* 993 F.2d 1525, 1528 (Fed.Cir.1993). However, the medical records also must be evaluated within the context of the whole record available for review. In the instant case, there is no contemporaneous medical documentation of the onset of Andrew's alleged symptoms following his August 29, 1988 fourth DPT shot, or of his condition within three days of receipt of the vaccine.

The United States Court of Appeals for the Federal Circuit has offered guidance on the issue of weighing the credibility of evidence, as follows:

[Petitioner] raises various other issues in her appeal, none of which merit extended discussion. Her contentions are essentially that various pieces of evidence should have been given more or less weight by the special master. Such arguments as to the weighing of evidence, particularly where, as here, witness credibility is involved, do not demonstrate reversible error. Regardless of whether the Claims Court, or we, would have found different facts on a retrial of the case, the issue which the Claims Court resolved and which we now review is only whether the findings and conclusions of the special master were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. . . ." 42 U.S.C. § 300aa–12(e)(2)(B).

*Hines v. Sec'y DHHS,* 940 F.2d 1518, 1527 (Fed.Cir.1991).

In the instant case, other than the evidence offered by members of Andrew's family, namely his mother, father and grandmother, petitioners have provided little or no support in the medical records, or other portions of the record to demonstrate that Andrew suffered a Vaccine Table injury within three days after receiving his fourth DPT vaccination, as alleged by petitioners. The only notation in the medical records regarding the onset of Andrew's communications disorder prior to the vaccination suggests that Andrew showed signs of developmental delays prior to the time he received his fourth DPT shot. At Andrew's 18–month checkup, Dr. White wrote in her record:

"few words 'O' phrases." Dr. White further explained, in an affidavit submitted for the record, that the "few words 'O' phrases" gave her concern "that he [Andrew] was falling off-track developmentally." Moreover, in the affidavit, Dr. White also stated that she does not recall Andrew's parents ever telling her that he had experienced a serious adverse reaction to his August 29, 1988 vaccination. In addition, when asked to list Andrew's symptoms for an evaluation of his developmental skills with Dr. Gail Sacks, on March 29, 1989, seven months after Andrew received the vaccination, Mrs. Epstein wrote that there was a decline in Andrew' language ability over "the past few months."

Furthermore, petitioners' medical experts who testified in the case, Drs. Geier and Mauk, each based their diagnosis on information provided by the petitioners, particularly Mrs. Epstein. Moreover, there is an absence of contemporaneous medical evidence regarding the days following Andrew's fourth DPT shot, because Andrew was not taken to a doctor for more than two weeks following his fourth DPT vaccination. There also is no indication in the records routinely kept by the Chestnut Hill Pediatric Group to indicate that Mrs. Epstein had called the office during the days immediately following the vaccination, nor did Andrew see a doctor until after September 15, 1988, more than two weeks following Andrew's fourth DPT vaccination. When Andrew was examined, he was diagnosed with roseola, an illness unrelated to the vaccination.

■ The special master concluded, and this court agrees, that the testimony of Dr. Geier, petitioners' expert, was far less credible than that offered by respondent's expert, Dr. Gale. In addition, Dr. Mauk's testimony was inconclusive, and Dr. Batshaw's conclusions on the important chronology of Andrew's developmental delays were altered at the request of Mrs. Epstein. Therefore, given the underlying unreliability of petitioners' expert testimony and the problems associated with Mrs. Epstein's testimony, the special master's determination to deny compensation was not arbitrary or capricious.

The petitioners also argue that the special master should have given more weight to the testimony of the parent petitioners. Petitioners seem to contend that the uncorroborated testimony of the parents should have been enough to prevail on their claim for compensation. The Vaccine Act clearly states that the special master may not find for the petitioner based solely on the claims of the petitioner, unsubstantiated by medical records or medical opinion. 42 U.S.C. § 300aa–13(a)(1).

Although there is precedent to support the proposition that a court may base a finding of a vaccine injury on lay testimony, in this case, there is simply no evidence in the record to support petitioners' claim of a vaccine-related injury. In cases in which a court has based a finding upon lay testimony, there must be corroborating evidence, either medical or otherwise, to support the claim. For example, in *Brown v. Sec'y DHHS*, 18 Cl.Ct. 834 (1989), *rev'd on other grounds*, 920 F.2d 918 (Fed.Cir.1990), the court found that a vaccination had occurred based on evidence consistent with the parent's testimony, which was included in the mother's personal calendar and the physician's billing statement for medical services, which showed a charge for the vaccine in question. In *Berry v. Sec'y DHHS*, No. 90–339V, 1990 WL 293448 (Cl. Ct.Spec.Mstr., November 15, 1990), the hospital records were found to address each element of petitioner's claim. In *Wonish v. Sec'y DHHS*, No. 90–667V, 1991 WL 83959 (Cl.Ct.Spec.Mstr., May 6, 1991), the parental testimony was corroborated by medical records referring back to the DPT shot. Similarly, in *Alger, by Alger v. Sec'y DHHS*, No. 89–31V, 1990 WL 293408 (Cl.Ct.Spec.Mstr., March 14, 1990), despite the absence of medical records, the finding that a vaccination had occurred was supported by testimony from the mother and from the doctor who administered the vaccination, and who was the infant's regular treating physician.

In contrast, and analogous to the instant case, in *Taylor, on behalf of Taylor v. Sec'y DHHS*, No. 90–857V, 1991 WL 115031 (Cl. Ct.Spec.Mstr., June 12, 1991), the testimony of a vaccination was corroborated in a baby book, but the court denied compensation. The *Taylor* court found that although the baby book provided evidence that an on-table

vaccine was administered, it contained no evidence that an on-table vaccine injury followed the vaccination. The court in *Taylor* stated:

> The only adverse reaction indicated in the baby book is that Raymond had a fever the night of July 12. The baby book also indicates on the 'Important Firsts' page that Raymond went shopping on July 14, 1979, and that he spent that night with 'Grandma Mamie,' which tends to indicate that Raymond's condition had not deteriorated at that time.

*Taylor, on behalf of Taylor v. Sec'y DHHS,* No. 90–857V, 1991 WL 115031, at *3 (Cl.Ct. Spec.Mstr., June 12, 1991),

In the present case, the parents' allegations and testimony are uncorroborated by any evidence, medical or otherwise. Andrew's baby book and calendar, prepared by Mrs. Epstein, contain inaccurate dates and some of the entries do not support her claims regarding the onset of Andrew's developmental and communications delays. For example, Andrew's baby book records his speaking certain new words and simple phrases after he received his fourth DPT vaccination and the alleged onset of his developmental delays. Mrs. Epstein confirmed that the baby book entries often failed to bear the correct dates as to the particular milestone that she recorded. She testified that the dates recorded for Andrew's milestones were not necessarily the dates he accomplished such milestones, and that she recorded dates to allow her to remember something that Andrew had said or done in the past. Given the disorganization of the entries in the baby book, combined with post-vaccination entries of verbal development, the baby book cannot be viewed as reliable evidence supporting petitioners' claims.

The medical records and Chestnut Hill Medical Group's phone logs also fail to offer any corroborating evidence that Andrew's developmental delay and communications disorder began manifesting itself within the three days after Andrew received his fourth DPT vaccination specified in the Vaccine Injury Table. As discussed above, because the Epsteins did not take Andrew to see a medical professional within three days following his fourth DPT vaccination, there are no contemporaneous medical records available. Furthermore, the record which was offered suggest that Andrew's language and developmental delays were identified before his fourth DPT vaccination.

Thus, in light of the inconsistencies included in the testimony and the exhibits offered by the petitioners, the lack of contemporaneous medical records corroborating petitioners' version of the events, and the lack of credibility regarding the testimony of petitioner's expert, especially of Dr. Geier when compared to the testimony of respondent's expert Dr. Gale, this court determines that the special master ruled correctly. The special master did not abuse her discretion when she determined that Andrew did not suffer an on-table injury within three days of his fourth DPT vaccination to warrant an award of compensation in the above-captioned case. The special master, moreover, made her findings using the correct preponderance of the evidence standard of proof.

■ Finally, the petitioners allege that the special master abused her discretion by violating the Federal Rules of Evidence. Petitioners, however, are not specific about which evidence was excluded or which rule was violated. The court notes, however, that under § 300aa–12(d)(2)(B), the special master is allowed to "include flexible and informal standards of the admissibility of evidence." The special master is not bound by the Federal Rules of Evidence and is free to consider all relevant evidence presented in the case. Thus, no error occurred, as claimed by the petitioners.

### CONCLUSION

After careful review of the record before this court and the applicable law, the court finds that the decision of the special master to deny compensation to the petitioners was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. As pointed out by the special master, "To be sure, the story of Andrew Epstein is indeed a tragic one and his unfortunate condition must be confronted on a daily basis by petitioners herein. It appears Mr. and Mrs.

480

Epstein are devoted parents with a firmly held belief that their son was injured by a DPT vaccination. Congress, however, designed the Program to compensate only those individuals who can demonstrate a causal or temporal like between their injuries and a listed vaccination by a preponderance of the evidence. In this instance, the evidence simply does not demonstrate such a link." Therefore, the petitioners' motion for review is, hereby, **DENIED**. The court, hereby, **AFFIRMS** the decision of the special master, dated October 31, 1995, denying compensation. The Clerk of the Court is directed to enter judgment in accordance with this decision.

IT IS SO ORDERED.

